# IN THE SUPREME COURT OF IOWA

No. 08–0412

Filed December 17, 2010

**STATE OF IOWA,**

Appellant,

vs.

**JAMES MAXIMILIANO OCHOA,**

Appellee.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Scott County, Christine Dalton Ploof, District Associate Judge.

State appeals district court order suppressing evidence obtained during a warrantless, suspicionless search of a parolee. **DECISION OF THE COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

Thomas J. Miller, Attorney General, Mary E. Tabor (until withdrawal), Cristen O. Douglass (until withdrawal), and then Thomas S. Tauber, Assistant Attorneys General, Karla J. Baumler, Student Legal Extern, Michael J. Walton, County Attorney, and Alan R. Havercamp, Assistant County Attorney, for appellant.

Mark C. Smith, State Appellate Defender, and Stephan J. Japuntich, Assistant Appellate Defender, for appellee.

**APPEL, Justice.**

In this case, we are called upon to determine the extent to which persons on parole are entitled to constitutional protections against unreasonable searches and seizures under the Iowa Constitution. Here, a police officer conducted a warrantless, suspicionless search of a parolee's motel room. The police officer conducting the search believed that standard "search condition" language in Iowa parole agreements authorized law enforcement officials to search the residence of a parolee at any time and for any reason. After the warrantless, suspicionless search produced drugs and drug paraphernalia, the parolee was arrested and charged with various drug-related crimes. The district court granted the parolee's motion to suppress the evidence. On discretionary review, the court of appeals reversed. For the reasons expressed below, we vacate the decision of the court of appeals and affirm the judgment of the district court.

## I. Factual and Procedural History.

Bettendorf police officer Jereme Hatler was conducting a routine business check at The Traveler, a motel located in a high-crime area in Bettendorf, Iowa. Hatler learned from the desk clerk that the defendant James Ochoa was staying in room 32. After conducting a computer check, Hatler determined that Ochoa was on parole arising from his conviction for conspiracy to commit a forcible felony. Hatler understood that persons on parole in Iowa were required to agree to be subject to search at any time, for any reason. Operating on this understanding, Hatler called Ochoa's room and asked Ochoa to step out. After a brief conversation, Hatler patted down Ochoa and asked if he could search Ochoa's motel room. According to Hatler:

> [Ochoa] initially said no and so I went ahead and patted him down and asked him if I could go ahead and search the room and he kind of—he said to me, well, you're going to anyway and I said, yes, I am and I proceeded to.

Hatler then entered the room and discovered a crack pipe, drug paraphernalia, a rocklike substance testing positive for cocaine, and prescription drugs not prescribed for Ochoa.

The State charged Ochoa with possession of a controlled substance and unlawful possession of a prescription drug. Ochoa filed a motion to suppress the evidence found in his motel room on both state and federal constitutional grounds. At the hearing on the motion to suppress, Hatler testified that he had no particular reason or cause for suspicion that illegal activity was occurring at the motel other than its location in a high-crime neighborhood, he had no particularized suspicion of unlawful activity with regard to Ochoa or room 32, and he would not have conducted the search "had we not been given the training we were given" (indicating that a parolee was subject to search at any time for any reason).

The State also introduced into evidence Ochoa's parole agreement. The parole agreement warned that "[f]ailure to comply with the terms and conditions may result in the revocation of your parole." The parole agreement then stated that "[t]he following are the standard terms and conditions that you agree to comply with while you are on parole." Listed as a standard term and condition of parole was:

> I will submit my person, property, place of residence, vehicle, personal effects to search at any time, with or without a search warrant, warrant of arrest or reasonable cause by any parole officer or law enforcement officer.

The following colloquy thereafter occurred between the court and counsel for the State:

Q: [W]hen I read these parole agreements, it doesn't take away his right to refuse, but he's being put on notice if he refuses a search or refuses to consent to a search, it could be a parole violation. Is that how you are reading it or am I way off the mark to read it that way? A: No, that's right.

Q: And you're arguing he consented, if that is true, or do you believe that he did consent in this situation? Because if I go in that direction, that answer is going to be important to me. I'm not asking for further argument, I am just asking the question. A: I think when faced with the realization that the officer knew the contents of the parole agreement, that he did not refuse or protest either the search of his person or his room.

The district court granted Ochoa's motion to suppress. The court observed that the search was based on an inaccurate understanding of the parole agreement and its relationship to constitutional protections against unreasonable searches and seizures. As conceded by the State, the district court stated that the parole agreement did not amount to a broad blanket waiver of constitutional rights but instead only a condition that, if violated, could give rise to a parole violation. While acknowledging recent United States Supreme Court Fourth Amendment cases allowing warrantless searches of parolees and probationers, the district court distinguished these cases because they involved reasonable suspicion or a statute that explicitly curtailed a parolee's Fourth Amendment rights. *See Samson v. California*, 547 U.S. 843, 126 S. Ct. 2193, 165 L. Ed. 2d 250 (2006) (permitting warrantless searches of parolees); *United States v. Knights*, 534 U.S. 112, 122 S. Ct. 587, 151 L. Ed. 2d 497 (2001) (permitting warrantless searches of probationers). Instead, the district court relied upon this court's decision in *State v. Cullison*, 173 N.W.2d 533, 538–39 (Iowa 1970), which held that a parolee did not surrender his Fourth Amendment rights by virtue of his status as

a parolee. The district court further found that Ochoa had not voluntarily consented to the search.

This court granted the State's application for interlocutory appeal and transferred the case to the court of appeals. On appeal, the State did not contend that Ochoa consented to the search at the doorway of his motel room. Instead, the State shifted positions and asserted that Ochoa consented in advance to the search by executing the parole agreement, a position abandoned by the State at the suppression hearing.

The court of appeals reversed the district court. Citing *Samson*, the court of appeals noted that parolees generally have a lower expectation of privacy than members of society at large. The court further emphasized that by signing his parole agreement, Ochoa was aware of his diminished Fourth Amendment protections. The court of appeals further held that in signing the parole agreement, Ochoa consented to the search. We granted further review and now vacate the decision of the court of appeals and affirm the judgment of the district court.

## II. Standard of Review.

Because the motion to suppress was based on a deprivation of the defendant's constitutional right against unlawful searches, this court's review is de novo. *State v. Kreps*, 650 N.W.2d 636, 640 (Iowa 2002). In conducting the de novo review, the court "make[s] an independent evaluation [based on] the totality of the circumstances as shown by the entire record." *State v. Breuer,* 577 N.W.2d 41, 44 (Iowa 1998).

## III. Relationship Between Federal and State Search and Seizure Law.

As the United States Supreme Court has emphasized, "It is fundamental that state courts be left free and unfettered by us in

interpreting their state constitutions." *Minnesota v. Nat'l Tea Co.*, 309 U.S. 551, 557, 60 S. Ct. 676, 679, 84 L. Ed. 920, 924 (1940). The independence of state courts in interpreting their own state constitutions in a fashion different than federal law has taken a firm root in state courts generally.[1] *See, e.g., State v. Lowry*, 667 P.2d 996, 999–1001 (Or. 1983); *Commonwealth v. Kilgore*, 719 A.2d 754, 757 (Pa. Super. Ct. 1998); *State v. Jewett*, 500 A.2d 233, 238–39 (Vt. 1985). In addition to the growing body of state court opinions, there is a large body of literature exploring independent approaches employed by state courts to constitutional provisions that includes a vast number of law review articles[2] and a number of treatises and monographs.[3]

---

[1]The power to independently interpret state constitutional provisions extends to those provisions identical to the federal model. *See, e.g., Wallace v. State*, 905 N.E.2d 371, 378 (Ind. 2009) (explaining that its state constitution has "unique vitality, even where its words parallel federal language"); *State v. McClendon*, 517 S.E.2d 128, 132 (N.C. 1999) (noting that a state court is not bound by federal precedent even when construing an identical provision in state constitution); *State v. Oliveira*, 961 A.2d 299, 308 n.12 (R.I. 2008) (stating that states are free to impose greater restrictions to protect its citizens, even though language is similar).

[2]There have been numerous law review symposia relating to the development of state constitutional law. *See generally* Symposium, *Emerging Issues in State Constitutional Law*, 73 Temp. L. Rev. 905 (2000); Robert F. Williams, *Twentieth Annual Issue on State Constitutional Law*, 39 Rutgers L.J. 799 (2008). A significant number of distinguished state supreme court justices have written law review articles on the topic. *See generally* Shirley S. Abrahamson, *Reincarnation of State Courts*, 36 Sw. L.J. 951 (1982); Joseph R. Grodin, *Some Reflections on State Constitutions*, 15 Hastings Const. L.Q. 391 (1988); Judith S. Kaye, *Contributions of State Constitutional Law to the Third Century of American Federalism*, 13 Vt. L. Rev. 49 (1988); Hans A. Linde, *E Pluribus— Constitutional Theory and State Courts*, 18 Ga. L. Rev. 165 (1984); Stewart G. Pollock, *State Constitutions as Separate Sources of Fundamental Rights*, 35 Rutgers L. Rev. 707 (1983); Robert F. Utter, *Swimming in the Jaws of the Crocodile: State Court Comment on Federal Constitutional Issues When Disposing of Cases on State Constitutional Grounds*, 63 Tex. L. Rev. 1025 (1985).

[3]*See generally* Jennifer Friesen, *State Constitutional Law: Litigating Individual Rights, Claims, and Defenses* (3d ed. 2000); James A. Gardner, *Interpreting State Constitutions: A Jurisprudence of Function in a Federal System* (2005); Robert A. Schapiro, *Polyphonic Federalism: Toward the Protection of Fundamental Rights* (2009); Robert F. Williams, *The Law of American State Constitutions* (2009).

Although many state constitutions have search and seizure language that is virtually identical to the Fourth Amendment, the movement toward independent state constitutional adjudication has had dramatic impact on the law of search and seizure. As of 2007, at least thirty-three state supreme courts have found greater protections for individual rights in the search and seizure context under state constitutional provisions than under the Fourth Amendment, and an additional seven states recognize their power to do so. *See* Michael J. Gorman*, Survey: State Search and Seizure Analogs,* 77 Miss. L.J. 417, 418–64 (2007); *see also* Stephen E. Henderson, *Learning from All Fifty States: How to Apply the Fourth Amendment and Its State Analogs to Protect Third Party Information from Unreasonable Search*, 55 Cath. U. L. Rev. 373, 393–412 (2006).

This court has to date generally developed a body of independent state constitutional law in the search and seizure area slowly and cautiously. In some cases, the court has simply treated the claim as a "search and seizure" claim without identifying whether an argument has been presented under the Fourth Amendment or article I, section 8. *See, e.g., State v. Blackman,* 346 N.W.2d 12, 14–15 (Iowa 1984); *State v. Luloff,* 325 N.W.2d 103, 105–06 (Iowa 1982). In other cases, it appears that the parties raised only a Fourth Amendment claim and not a claim under the Iowa Constitution. *See, e.g., State v. Washburne,* 574 N.W.2d 261, 267 (Iowa 1997); *State v. Folkens,* 281 N.W.2d 1, 3 (Iowa 1979); *State v. King,* 191 N.W.2d 650, 654–57 (Iowa 1971). In addition, there are cases where search and seizure claims are made, but the court does not engage in any independent analysis of the parallel state constitutional provision, perhaps because the parties did not make an independent argument under the state constitution. *See, e.g., State v.*

*Howard*, 509 N.W.2d 764, 766–68 (Iowa 1993); *State v. Keehner*, 425 N.W.2d 41, 42–45 (Iowa 1988).

There are a few cases that directly deal with the relationship between the state and federal constitutional provisions. Relying on contract cases dating back to the 1930s, we stated that the Fourth Amendment and article I, section 8 are "identical in scope, import, and purpose" and that " '[w]e have an interest in harmonizing our constitutional decisions . . . when reasonably possible.' " *State v. Groff*, 323 N.W.2d 204, 207–08 (Iowa 1982) (quoting *State v. Olsen*, 293 N.W.2d 216, 219–20 (Iowa 1980)). We have also stated that decisions of the United States Supreme Court are entitled to "special respect." *State v. Davis*, 304 N.W.2d 432, 434 (Iowa 1981). In 1985, we declared that "our interpretation of article I, section 8 has quite consistently tracked with prevailing federal interpretations" in deciding search and seizure issues. *Kain v. State*, 378 N.W.2d 900, 902 (Iowa 1985); *accord State v. Showalter*, 427 N.W.2d 166, 168 (Iowa 1988).

Cumulatively, these older cases embrace what has been called a "lockstep" approach to interpretation of state constitutional provisions. *See* Robert F. Williams, *A "Row of Shadows": Pennsylvania's Misguided Lockstep Approach to Its State Constitutional Equality Doctrine*, 3 Widener J. Pub. L. 343, 344–48 (1993). Under the lockstep approach, a state court adopts prevailing federal authority in its interpretation of parallel state constitutional provisions, even though theoretically recognizing their independent nature.[4]

---

[4]Advocates of lockstep argue that it has the virtue of clarity because it eliminates the prospect that state constitutional law is different than federal constitutional law. *See* Paul S. Hudnut, *State Constitutions and Individual Rights: The Case for Judicial Restraint*, 63 Denv. U. L. Rev. 85, 90–98 (1985). The benefit of uniformity, however, has been sharply questioned. *See* Akhil Reed Amar, *A Neo-Federalist View of Article III: Separating the Two Tiers of Federal Jurisdiction*, 65 B.U. L. Rev. 205, 220–21 (1985)

The lockstep approach has resulted in instances of whipsawing where this court was in the awkward position of reversing recent precedent in response to Supreme Court cases. For example, in *Groff* we reversed prior precedent involving good faith mistakes in affidavits supporting search warrants in light of the subsequent Supreme Court decision in *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978). *Groff*, 323 N.W.2d at 207–08. The only intervening event that affected the reasoning of prior precedent was the *Franks* opinion. Similarly, in *State v. Baych*, 169 N.W.2d 578 (Iowa 1969), we held that the State had the burden of showing consent in search and seizure cases by "clear and convincing" evidence. *Baych*, 169 N.W.2d at 583, *overruled on other grounds by State v. Erickson*, 362 N.W.2d 528, 530 (Iowa 1985). We *sub silentio* reversed our position in *Bettuo v. Pelton*, 260 N.W.2d 423, 425 (Iowa 1977), in light of the Supreme Court's intervening footnote in *United States v. Matlock*, 415 U.S. 164, 177 n.14, 94 S. Ct. 988, 996 n.14, 39 L. Ed. 2d 242, 253 n.14 (1974).

The lockstep approach has not been universally accepted, even in its heyday. For instance, in *State v. Roth*, 305 N.W.2d 501, 508–11 (Iowa 1981) (McCormick, J., dissenting), the dissent urged that the court depart from *South Dakota v. Opperman*, 428 U.S. 364, 375–76, 96 S. Ct. 3092, 3100, 49 L. Ed. 2d 1000, 1009 (1976), a case where the United States Supreme Court allowed the warrantless search of a closed paper bag as part of an inventory search of a car. Noting that the South Dakota Supreme Court on remand departed from the Supreme Court

_____

(noting that it is not at all clear that uniformity is a value inherent in constitutional structure); Ronald K.L. Collins, *Foreword: The Once 'New Judicial Federalism' and Its Critics*, 64 Wash. L. Rev. 5, 15–17 (1989) (arguing that independent state constitutional rules are no different than different definitions of crimes or different state procedural rules).

under its state constitution, the minority emphasized that Iowa had a proud tradition of concern for individual rights and that this court "should not be reluctant to show greater sensitivity to the rights of Iowans under our constitution than the Supreme Court accords to their rights under the Federal Constitution." *Roth*, 305 N.W.2d at 510–11.

More recently, however, we have tended to emphasize independence from the federal model. In particular, in *State v. Cline*, 617 N.W.2d 277 (Iowa 2000), we rejected the good faith exception to the exclusionary rule that had been adopted by the United States Supreme Court. *Cline*, 617 N.W.2d at 293, *abrogated on other grounds by State v. Turner*, 630 N.W.2d 601, 606 n.2 (Iowa 2001). In *Cline*, we cited past cases suggesting that interpretations of state constitutional law should be consistent with federal law when possible, but we emphasized that "if precedent is to have any value it must be based on a convincing rationale." *Id.* at 285 (quoting *State v. James*, 393 N.W.2d 465, 472 (Iowa 1986) (Lavorato, J., dissenting)). We further stated that the court would "abdicate its constitutional role in state government were it to blindly follow federal precedent on an issue of state constitutional law." *Id.* We have subsequently emphasized that while we recognize opinions of the United States Supreme Court as "persuasive," we "jealously" protect our authority to follow our own independent approach. *See Zaber v. City of Dubuque*, 789 N.W.2d 634, 654 (Iowa 2010); *State v. Hoskins*, 711 N.W.2d 720, 725 (Iowa 2006). This Iowa case law shows a slow but perceptible shift away from a lockstep or lockstep-lite approach toward a greater recognition of the independent nature of our state constitutional provisions.

There is of course little doubt that, in light of the nearly identical language in article I, section 8 and the Fourth Amendment, they were

generally designed with the same scope, import, and purpose. *See, e.g., Kreps*, 650 N.W.2d at 640–41. But this generality does nothing to aid us in resolving concrete cases. Further, we agree with the commentators and developing case law in other states that a state supreme court cannot delegate to any other court the power to engage in authoritative constitutional interpretation under the state constitution. *See* Dorothy T. Beasley, *The Georgia Bill of Rights: Dead or Alive?*, 34 Emory L.J. 341, 415–19 (1985); Robert A. Schapiro, *Identity and Interpretation in State Constitutional Law*, 84 Va. L. Rev. 389, 391–96 (1998).

In order to resolve any inconsistency in our prior cases, we now hold that, while United States Supreme Court cases are entitled to respectful consideration, we will engage in independent analysis of the content of our state search and seizure provisions. A Fourth Amendment opinion of the United States Supreme Court, the Eighth Circuit Court of Appeals, or any other federal court is no more binding upon our interpretation of article I, section 8 of the Iowa Constitution than is a case decided by another state supreme court under a search and seizure provision of that state's constitution. The degree to which we follow United States Supreme Court precedent, or any other precedent, depends solely upon its ability to persuade us with the reasoning of the decision. When both federal and state constitutional claims are raised, we may, in our discretion, choose to consider either claim first in order to dispose of the case, or we may consider both claims simultaneously.[5]

---

[5]There is nothing unusual about the evolution of our case law. For instance, the Oregon Supreme Court in *State v. Florance*, 527 P.2d 1202, 1209 (Or. 1974), embraced the lockstep approach, noting that "the law of search and seizure is badly in need of simplification for law enforcement personnel, lawyers, and judges." In *State v. Caraher*, 653 P.2d 942, 946–48 (Or. 1982), however, the court abandoned the lockstep approach in favor of independent constitutional analysis. *See generally* Jack L. Landau, *Should State Courts Depart from the Fourth Amendment? Search and Seizure, State Constitutions, and the Oregon Experience*, 77 Miss. L.J. 369 (2007) (explaining that state constitutions have significance independent of the Federal Constitution).

**IV. Validity of a Search of a Parolee by a Law Enforcement Officer Without Individualized Suspicion.**

**A. Textual Analysis of Article I, Section 8.** We begin our analysis with a review of the text of article I, section 8 of the Iowa Constitution. Article I, section 8 of the Iowa Constitution provides:

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated; and no warrant shall issue but on probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the persons and things to be seized.[6]

As with the Fourth Amendment, the text of article I, section 8 presents a number of ambiguities and interpretive issues. To start with, the relationship between the first clause, the Reasonableness Clause, and the second clause, the Warrant Clause, is not entirely clear. For instance, it could be argued that the Warrant Clause demonstrates that a search without particularity and probable cause was a type of unreasonable search. Or, the clauses could be considered completely independent of each other, namely, that for warrantless searches the only requirement was "reasonableness," and that the particularity and probable cause requirements related only to searches by means of a warrant. *See* Silas J. Wasserstrom, *The Fourth Amendment's Two Clauses,* 26 Am. Crim. L. Rev. 1389, 1389–90 (1989).[7]

---

[6]The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

[7]Interestingly, Article XIV of the Massachusetts Constitution of 1780, which served as a basis of the Fourth Amendment, has a somewhat different formulation. Specifically, Article XIV provides:

> Every subject has a right to be secure from all unreasonable searches and seizures of his person, his house, his papers, and all his

There is one linguistic difference between article I, section 8 and the Fourth Amendment. Article I, section 8 utilizes a semicolon to separate the Reasonableness Clause from the Warrant Clause, while the Fourth Amendment uses a comma. Ordinarily, a semicolon is used to emphasize the relationship between the two clauses of a sentence. William Strunk, Jr. & E. B. White, *The Elements of Style* 6 (4th ed. 2000) (stating that the semicolon suggests a "close relationship between the two statements" and that the relationship is "commonly one of cause and consequence"). We have found no contemporaneous explanation of the use of the semicolon.

It is clear, however, that the Reasonableness Clause cannot be used to override the Warrant Clause. Otherwise, the Warrant Clause would be mere surplusage. Yet, if the Reasonableness Clause and the Warrant Clause are related, the precise contours of that relationship are not self-evident from the language. Further, the term "unreasonable,"

---

possessions. All warrants, *therefore*, are contrary to this right, if the cause or foundation of them be not previously supported by oath or affirmation, and if the order in the warrant to a civil officer, to make search in suspected places, or to arrest one or more suspected persons, or to seize their property, be not accompanied with a special designation of the person or objects of search, arrest, or seizure; and no warrant ought to be issued, but in cases, and with the formalities prescribed by the laws.

Mass. Const. of 1780 art. XIV (emphasis added); *see also* Nelson B. Lasson, *The History and Development of the Fourth Amendment to the United States Constitution* 82 (1937). Plainly, the use of the phrase "therefore" demonstrates that under the Massachusetts version of search and seizure, the general reasonableness requirement is implemented by requiring that warrants be particular rather than general.

Also, James Madison's draft of the Fourth Amendment did not contain the "unreasonable searches and seizures" language. Samuel Dash, *The Intruders: Unreasonable Searches and Seizures From King John to John Ashcroft* 43–44 (2004). The legislative history behind the addition of the Reasonableness Clause is sparse and inconclusive. William J. Cuddihy, *The Fourth Amendment: Origins and Original Meaning, 602–1791*, at 729 (2009).

considered alone, is highly ambiguous. As a result, this case cannot be decided based on the clear linguistic dictates of article I, section 8.

**B. Historical Context of Enactment of the Fourth Amendment.**

1. *Introduction.* The history of the circumstances prior to enactment of the Fourth Amendment has been thoroughly explored by scholars. *See generally* Thomas K. Clancy, *The Fourth Amendment: Its History and Interpretation* 23–43 (2008) [hereinafter Clancy, *Fourth Amendment*]; William J. Cuddihy, *The Fourth Amendment: Origins and Original Meaning, 602–1791*, at 1–597 (2009) [hereinafter Cuddihy]; Phillip A. Hubbart, *Making Sense of Search and Seizure Law: A Fourth Amendment Handbook* 21–75 (2005) [hereinafter Hubbart]; Jacob W. Landynski, *Search and Seizure and the Supreme Court: A Study in Constitutional Interpretation* 19–49 (1966) [hereinafter Landynski]; Nelson B. Lasson, *The History and Development of the Fourth Amendment to the United States Constitution* 13–105 (1937) [hereinafter Lasson]; Andrew E. Taslitz, *Reconstructing the Fourth Amendment: A History of Search and Seizure, 1789–1868*, at 1–68 (2006) [hereinafter Taslitz]; Telford Taylor, *Two Studies in Constitutional Interpretation: Search, Seizure, and Surveillance and Fair Trial and Free Press* 19–44 (1969). These authorities are in general agreement that the Fourth Amendment arose against a background of developing English law and in the specific context of colonial frustration over the execution of searches of homes by British authorities pursuant to general warrants or writs of assistance.

2. *English antecedents.* In seventeenth century England, the Crown resorted to general warrants to search for books and pamphlets considered libelous or seditious and to enforce customs laws. Lasson at 30–31. These warrants were open-ended as to time, place, and duration.

*Id.* at 32. The power to search and seize generally was based upon the police power of the Crown and not upon actions of Parliament. Clancy, *Fourth Amendment* at 28.

In light of the lack of limitation on executive power, it is not surprising that abuses arose. Sir Edward Coke, who opposed general warrants as "against reason" and based on "mere surmise," was one of the Crown's most influential opponents. Taslitz at 18, 37, 41. Coke was infamously searched by agents of the Crown in 1634 for seditious and libelous papers while Coke lay on his death bed. *Id.* at 18. The agents seized, among other things, a poem addressed to his children and his will. Lasson at 31; Leonard W. Levy, *Origins of the Bill of Rights* 153 (2001). It seems fair to say that political motivation was at work in this affair.

More than a century later, Lord Halifax sought to suppress and punish the sedition contained in Number 45 of a publication known as the *North Briton*, which attacked the King's speech given at the opening of Parliament. Hubbart at 41. Halifax issued general warrants to four agents, ordering them to "make strict and diligent search for the authors, printers, and publishers of . . . *The North Briton*, No. 45 . . . and them, or any of them, having found, to apprehend and seize, together with their papers." Lasson at 43. Forty-nine persons were arrested in three days of dragnet. Clancy, *Fourth Amendment* at 36; Hubbart at 41. When the messengers located the printers and learned that Wilkes was the author of the *North Briton* material, Wilkes and his private papers were seized, including the uninventoried papers in the drawers of his bureau. Clancy, *Fourth Amendment* at 36; Lasson at 44; Taslitz at 20. Wilkes denounced the warrant as "a ridiculous warrant against the whole English nation," refused to leave his premises upon his arrest, and had

to be carried to London Tower, from which he was eventually released because of his status as a member of Parliament. Landynski at 28. Ultimately, however, the House of Commons voted Number 45 a seditious libel and expelled Wilkes, who eventually served a jail term for his offense. Taslitz at 20.

Wilkes sued the overseer of the warrant and obtained a judgment in the famous case of *Wilkes v. Wood*, (1763) 98 Eng. Rep. 489 (C.P.). The matter was tried by Chief Judge Pratt, who in an earlier case arising out of the *North Briton* incident had declared that "[t]o enter a man's house by virtue of a nameless warrant, in order to procure evidence, is worse than the Spanish Inquisition, a law under which no Englishman would wish to live an hour." Taslitz at 20.

In the *Wilkes* case, Chief Judge Pratt questioned the warrants for "failing to specify the offenders' names in the warrant and for giving the messengers the discretionary power to search wherever their suspicions chanced to fall." Clancy, *Fourth Amendment* at 36. Wilkes ultimately obtained a judgment against Wood and, later, against Lord Halifax himself on the ground that the warrant was illegal and that Halifax's agents engaged in trespass. Hubbart at 42; Lasson at 45.

After the *Wilkes* case, Pitt the Elder gave his much quoted speech in Parliament, where he declared:

> The poorest man may, in his cottage, bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England may not enter; all his force dares not cross the threshold of the ruined tenement.

Lasson at 49–50.

A similar result occurred in *Entick v. Carrington*, (1765) 95 Eng. Rep. 807 (C.P.), after John Entick's books were seized by Halifax's

agents. Lasson at 47. In this case, Entick was named in the warrant, which generally authorized seizure of his papers. Taslitz at 21; Clancy, *Fourth Amendment* at 48. The case was tried by Judge Pratt, now Lord Camden, who issued a strongly worded opinion which, among other things, rejected arguments that general warrants were necessary to advance the ends of government in preventing libelous publications. Hubbart at 45. Lord Camden noted: "[I]f suspicion at large should be a ground of search, especially in the case of libels, whose home would be safe?" *Id.*

The *Wilkes* and *Entick* cases were well-known in the American colonies. Paul Revere made a silver punch bowl with engraving "No General Warrants," "Wilkes and Liberty," and "No. 45." *Id.* at 47. Wilkes received letters of support from John Adams and Joseph Warren. *Id.* Wilkes became a popular figure in America. Taslitz at 21.

3. *Colonial experience.* Nearly simultaneously with the *Wilkes* and *Entick* matters in England, controversy arose in the American colonies regarding writs of assistance, which allowed general searches for customs violations. Clancy, *Fourth Amendment* at 31. Unlike the general warrant cases, which involved government efforts to stamp out seditious libel, the writs of assistance focused on Britain's mercantile policy and the imposition of customs duties to protect British interests. Hubbart at 21. The writs were separately issued by colonial courts to individual customs officials in port cities. *Id.* The writs of assistance were even broader than the general warrants arising from the *North Briton* episode, which at least arose out of a specific incident, namely, the publishing of the *North Briton*, No. 45. The writs of assistance were not returnable after execution, but continued to authorize general searches during the life of the sovereign. Lasson at 54. The writs of assistance were akin to

"permanent search warrants placed in the hands of customs officials: they might be used with unlimited discretion." Landynski at 31.

As early as 1696, Parliament had enacted legislation that was thought to allow writs of assistance in the American colonies. Clancy, *Fourth Amendment* at 32. The writs of assistance expired with the death of King George II in 1760, and the question arose whether new writs of assistance would be issued*. Id.*

Boston merchants banded together and fought the issuance of new writs of assistance. Tracey Maclin, *The Complexity of the Fourth Amendment: A Historical Review,* 77 B.U. L. Rev. 925, 946 (1997) [hereinafter Maclin]. In *Paxton's Case,* James Otis protested against judicial grants of writs of assistance, which gave customs officers open-ended authority to search homes for evidence of customs violations. *Id.* In place of the open-ended authority of the writs of assistance, Otis urged specific warrants based on oath or affirmation. *Id.*; Cuddihy at 377–78.

Otis's attack on the writs of assistance focused on the arbitrary invasion of houses. In his brief, Otis insisted that only specific warrants were reasonable and that "the freedom of one's house" was among "the most essential branches of English liberty." Cuddihy at 377–78. According to John Adams, Otis argued that " '[t]his writ is against the fundamental principles of law, the privilege of house.' " Landynski at 34 (quoting 2 John Adams, *Life and Works of John Adams* 523 (1856)).

When Otis lost his case, the Massachusetts General Court attempted to enact a measure requiring particularity in writs of assistance and limiting their life, only to be vetoed by the governor. *Id.* at 35. Over the next fifteen years, however, opposition to writs of assistance persisted as Britain attempted to extend its control over the colonies through the Stamp and Townshend Acts, which were potentially

enforceable through writs of assistance. *Id.* at 36; M.H. Smith, *The Writs of Assistance Case* 2 (1978) [hereinafter Smith]. The Townshend Act, for instance, vested the power to issue writs of assistance in American judges. Smith at 2. Many of them balked, with some judges refusing to issue the writs except for a single location supported by sworn affirmation. *See id.* American judicial intransigence was sufficiently strong that local customs officials in several states did not even bother to apply for the writs. *Id.* at 3–5.

*Paxton's Case* and its aftermath suggest that the Fourth Amendment was enacted against a backdrop of controversy over the appropriateness of general search authorizations as reflected in the writs of assistance. Commenting on Otis's performance many years later, John Adams observed " '[t]hen and there the Child Independence was born.' " Landynski at 37 (quoting 10 John Adams, *Life and Works of John Adams* 247–48 (1856)).

4. *Scholarly interpretation of historical context.* Nearly all contemporary scholars and most courts accept the general contours of the Fourth Amendment historical narrative presented above. The scholars, however, sharply disagree on the proper interpretation arising from the historical record and from the Fourth Amendment's language. Professor Maclin argues that the history supports a warrant-preference rule. Maclin, 77 B.U. L. Rev. at 950–59; *see also* Silas J. Wasserstrom, *The Incredible Shrinking Fourth Amendment*, 21 Am. Crim. L. Rev. 257, 295–304 (1984). In contrast, Professor Amar has suggested that the main thrust of the Fourth Amendment is the reasonableness requirement. Akhil Reed Amar, *Fourth Amendment First Principles*, 107 Harv. L. Rev. 757, 762–81 (1994). Other scholars have joined the fray. *See, e.g.,* Thomas Y. Davies, *Recovering the Original Fourth Amendment,*

98 Mich. L. Rev. 547, 601–619 (1999) [hereinafter Davies, *Recovering*] (arguing that warrantless searches and seizures were virtually unheard of and not addressed by the Fourth Amendment); David E. Steinberg, *The Uses and Misuses of Fourth Amendment History*, 10 U. Pa. J. Const. L. 581, 583 (2008) (arguing that although warrantless searches were relatively common, the Fourth Amendment intended to focus on a single, narrow problem, namely, physical trespass into houses by government agents).

The bottom line, however, is that there is no overarching consensus in the secondary historical scholarship regarding the meaning of the Fourth Amendment that would inexorably dictate an outcome in this concrete case. Aside from the different perspectives on the meaning of the historical record, two additional realities limit the usefulness of any effort to uncover the intent of the framers through historical analysis. First, as noted by Professor Davies, the modern police officer bears little resemblance to the framing era constable working under the direction of a justice of the peace. Davies, *Recovering*, 98 Mich. L. Rev. at 620–24. Second, parole systems in the United States were introduced by Zebulon Brockway about eighty years *after* the Constitutional Convention. *See* Joan Petersilia, *Parole and Prisoner Reentry in the United States*, 26 Crime & Just. 479, 488 (1999). These difficulties do not render consideration of historical circumstances irrelevant in this case, but they do require a necessarily imprecise extrapolation process where the emphasis is on application of constitutional values to the modern problem.

5. *Summary.* The linguistic and historical materials suggest the framers of the Fourth Amendment, and by implication the framers of article I, section 8 of the Iowa Constitution, intended to provide a limit on

arbitrary searches and seizures, particularly those involving the home. Specifically, the drafters rejected general warrants without probable cause and without particularity as reflected in pre-Revolutionary practice. The evidence tends to support the conclusion of Phillip Hubbart, who in his treatise declares that:

> [T]he Framers of the Fourth Amendment, along with the colonial leadership of the period, intended to prohibit all general warrants of search and arrest by requiring special warrants based on sworn proof of criminal wrongdoing that particularly described the place to be searched and the things or persons to be seized, as the usual method for the search of private premises by government agents . . . .

Hubbart at 77.

There is a debate regarding whether warrantless searches were accepted by the framers and, if they were, what legal standard should apply to them. It is doubtful, however, that the framers intended warrantless searches to provide a broad avenue to avoid the particularity and probable cause requirements of the Warrant Clause in cases involving searches of private premises. It would make no sense to restrict general warrants and yet allow the same type of broad, unlimited search without a warrant. The framers were likely most concerned with the substance of the right, not with procedural distinctions. Maclin, 77 B.U. L. Rev. at 959. In short, all other things being equal, the historical context of the Fourth Amendment suggests a preference for particularity as a tool to cabin police power along with a recognition of the need to provide private premises with a high degree of protection against arbitrary government intrusion.

**C. Contemporaneous Discussions Regarding Search and Seizure Provisions.**

1. *Contemporaneous discussions regarding the Fourth Amendment.* Because of the similarity of language between the state and federal search and seizure provisions, it is appropriate to look to contemporaneous commentary regarding the values and purposes of the Fourth Amendment to inform our consideration of the proper interpretation of article I, section 8 of the Iowa Constitution. Unfortunately, however, the framers did not provide us with direct commentary.

At the constitutional convention, the possibility of adding a Bill of Rights was raised only five days before adjournment. Lasson at 83. When George Mason proposed a Bill of Rights at this late date, it was rejected, perhaps out of fatigue as much as reason. *See* Richard Labunski, *James Madison and the Struggle for the Bill of Rights* 9 (2006). The primary objection stated at the convention was that the federal government was one of limited powers, making a Bill of Rights unnecessary. *Id.*

When the Constitution was submitted to the state ratifying conventions, the discussion regarding the omission of a Bill of Rights played a central role. In Virginia, Patrick Henry argued that unless a right was reserved to the people in the Constitution, it would be relinquished to the rulers. *Id.* at 105. In particular, Henry argued that federal officers could "go into your cellars and rooms, and search, ransack and measure, every thing you eat, drink, and wear" without constitutional restraints. *Id.* In order to ensure ratification, Madison and other Federalists engaged in a compromise by promising that once the Constitution was ratified, an amendment would be proposed in the

next Congress to add a Bill of Rights. Bernard Schwartz, *The Great Rights of Mankind: A History of the American Bill of Rights* 120 (1992). This ratify-and-recommend approach carried the day in five states— Massachusetts, South Carolina, New Hampshire, Virginia, and New York. *Id.*

When the first Congress convened, Madison, true to his word, proposed a Bill of Rights. With respect to search and seizure, Madison's original text was a one-barreled affair that was patterned after the Massachusetts Bill of Rights. It provided:

> The right of the people to be secure in their persons, houses, papers, and effects, shall not be violated by warrants issuing without probable cause, supported by oath or affirmation, and not particularly describing the place to be searched, and the persons or things to be seized.

Samuel Dash, *The Intruders: Unreasonable Searches and Seizures from King John to John Ashcroft* 43–44 (2004).

The House of Representatives, sitting as a Committee of the Whole, rejected an amendment offered by Edgar Benson that would have injected a reasonableness clause, and Madison's version was sent to a small committee for styling chaired by Benson. *Id.* The version that emerged from the committee included Benson's reasonableness clause and was ultimately approved without meaningful discussion. *Id.*

There also seems to have been very little substantive discussion of the meaning of the Fourth Amendment in the subsequent ratification process. *See* Cuddihy at 733; Schwartz at 187. It seems that most observers were concerned not about parsing the language of the proposals, but only with general principles.

It is clear, however, that both Federalists and Anti-Federalists were firmly opposed to the pre-Revolutionary practice of general warrants and

writs of assistance that allowed agents of the Crown to enter houses, warehouses, and businesses.  The debate was over how best to ensure that the colonial experience would not be repeated.  The Fourth Amendment was thus unquestionably designed to limit, and not to expand, the powers of the federal government.  As noted by Chief Justice John Marshall, who served as a delegate to the Virginia ratification convention, the amendments were designed "to guard against the abuse of power."  *Barron v. City of Baltimore*, 32 U.S. (7 Pet.) 243, 250, 8 L. Ed. 672, 675 (1833).

2.  *Contemporaneous discussions regarding article I, section 8 of the Iowa Constitution.*  We have been unable to uncover any meaningful contemporaneous commentary regarding the meaning of the search and seizure provision in article I, section 8 of the Iowa Constitution.  In 1838, six years before Iowa's first constitutional convention, a state court held that, in order for a search to be reasonable, it had to be executed pursuant to a warrant.  *Banks v. Farewell*, 38 Mass. (21 Pick.) 156, 159 (1838).  No evidence exists, however, to show that the Iowa framers were aware of this case law.  Despite this, other historical evidence tends to shed light on the value the Iowa framers placed on article I, section 8.

As a general matter, the drafters of the Iowa Constitution placed the Iowa Bill of Rights at the beginning of the constitution, for apparent emphasis.  Further, the materials related to the constitutional conventions emphasize the need to restrain arbitrary government power.  For example, the debate over the 1857 Iowa Constitution notes the need for a Bill of Rights, providing that "[t]he annals of the world . . . furnish many instances in which the freest and most enlightened governments that have ever existed upon earth, have been gradually undermined, and actually destroyed, in consequence of the people's rights."  1 *The Debates*

*of the Constitutional Convention of the State of Iowa* 100–01 (W. Blair Lord rep., 1857), *available at* http://www.statelibraryofiowa.org/services/law-library/iaconst.  As a result, the record of the 1857 convention indicates a desire

> to put upon record every guarantee that could be legitimately placed [in the constitution] in order that Iowa not only might be the first State in the Union, unquestionably as she is in many respects, but that she might also have the best and most clearly defined Bill of Rights.

*Id.* at 100.

Additionally, it is clear that the Iowa framers placed considerable value on the sanctity of private property and, more specifically, of the home.  For example, Governor Lucas stated that he deemed the most important right was "to secure to the poor man a little spot of ground where he could build him a cottage and have a home for himself and family, free from the fear of being turned out of doors." *Fragments of the Debates of the Iowa Constitutional Conventions of 1844 and 1846*, at 159–61 (1900).  Although the language is clearly an expression of the politics of the Jacksonian Era, the notion of the sanctity of the home was a concept that the Iowa framers clearly endorsed.

**D. Discussion of United States Supreme Court Search and Seizure Precedents.**  With textual and historical analysis providing us general guidance, we now turn to case law that has offered further definition to the general constitutional commands of the search and seizure provisions.  We begin our discussion with a review of cases of the United States Supreme Court.  The persuasive power of *Samson* can only be evaluated with a full understanding of the trajectory of case law under the Fourth Amendment.

1. *Evolution of interests protected by the Fourth Amendment.* The United States Supreme Court did not have occasion to explore the contours of the Fourth Amendment until the late nineteenth century. In *Boyd v. United States*, 116 U.S. 616, 6 S. Ct. 524, 29 L. Ed. 746 (1886), the Supreme Court considered the application of the Fourth Amendment in a case where the defendant was ordered to produce an invoice regarding the value and quantity of glass in a forfeiture proceeding. *Boyd*, 116 U.S. at 618, 6 S. Ct. at 526, 29 L. Ed. at 747, *abrogated on other grounds by Bellis v. United States*, 417 U.S. 85, 94–95, 94 S. Ct. 2179, 2186, 40 L. Ed. 2d 678, 687–88 (1974). Concluding that the order to produce the invoice amounted to a "search," the Court held that the order violated the Fourth Amendment and that it should be excluded from trial. *Id.* at 638, 6 S. Ct. at 536, 29 L. Ed. at 753. Given the tangible nature of the language of the Fourth Amendment regarding "papers, houses, persons, and effects," the *Boyd* opinion emphasized property rights concepts and the notion of constitutionally protected areas. *See id.* at 627–30, 6 S. Ct. at 530–32, 29 L. Ed. at 748–50. Under the reasoning in *Boyd*, the home was a constitutionally hardened target that could not be penetrated by court order to obtain evidence in a criminal trial. *Id.* at 630, 6 S. Ct. at 532, 29 L. Ed. at 751.

With the development of increasingly intrusive technology, the question arose whether a property-rights theory of the Fourth Amendment was adequate. In *Olmstead v. United States*, 277 U.S. 438, 48 S. Ct. 564, 72 L. Ed. 944 (1928), the Supreme Court applied property-rights concepts in rejecting a claim that the Fourth Amendment prohibited electronic eavesdropping where no physical trespass occurred. *Olmstead*, 277 U.S. at 466, 48 S. Ct. at 569, 72 L. Ed. at 951, *overruled by Katz v. United States*, 389 U.S. 347, 353, 88 S. Ct. 507, 512, 19 L. Ed.

2d 576, 583 (1967). The *Olmstead* court stated that the Fourth Amendment protected searches and seizures of houses, persons, papers, and effects but did not forbid the government from gathering information based on hearing or sight where there was no physical trespass. *Id.* at 465–66, 48 S. Ct. at 568, 72 L. Ed. at 950–51. As a result, cases after *Boyd* and *Olmstead* generally emphasized property rights and protected areas. *See, e.g., Lanza v. New York*, 370 U.S. 139, 142–44, 82 S. Ct. 1218, 1220–21, 8 L. Ed. 2d 384, 387–88 (1962). Under the approach of *Boyd* and *Olmstead*, the protection offered by the Fourth Amendment was narrow but deep.

Determined to extend Fourth Amendment protections to cover technological intrusions, the Warren Court came to deemphasize the property-rights approach in favor of a theory based on protection of privacy interests. The trend came to a head in three cases decided in 1967. *See Katz v. United States*, 389 U.S. 347, 353, 88 S. Ct. 507, 512, 19 L. Ed. 2d 576, 583 (1967) (stating that "the Fourth Amendment protects people—and not simply 'areas'—against unreasonable searches and seizures"); *Berger v. New York*, 388 U.S. 41, 52, 87 S. Ct. 1873, 1880–81, 18 L. Ed. 2d 1040, 1049 (1967) (noting that the basic purpose of the Fourth Amendment is to " 'safeguard the privacy and security of individuals against arbitrary invasions by governmental officials' " (quoting *Camara v. Mun. Ct.*, 387 U.S. 523, 528, 87 S. Ct. 1727, 1730, 18 L. Ed. 2d 930, 935 (1967))); *Warden v. Hayden*, 387 U.S. 294, 304, 87 S. Ct. 1642, 1648, 18 L. Ed. 2d 782, 790 (1967) (observing that "[t]he premise that property interests control the right of the Government to search and seize has been discredited"). By protecting expectations of privacy, the Court extended the protections of the Fourth Amendment

into areas, such as electronic eavesdropping, without requiring a physical trespass.

The importation of the concept of privacy into the Fourth Amendment was not accomplished without dissent. Justice Black, among others, argued that the injection of privacy into the Fourth Amendment was pernicious because privacy, "like a chameleon, has a different color for every turning." *Berger,* 388 U.S. at 77, 87 S. Ct. at 1893, 18 L. Ed. 2d at 1063 (Black, J., dissenting). Commentators have suggested that the more defined property-rights notions were replaced by "a malleable notion of privacy lacking any core of substantive rights." Morgan Cloud, *A Liberal House Divided: How the Warren Court Dismantled the Fourth Amendment,* 3 Ohio St. J. Crim. L. 33, 72 (2005). Justice Black feared that the amorphous standard of privacy lacked the sinew to withstand what Justice Douglas once referred to as the "hydraulic pressures" favoring expansive police power at the expense of privacy and liberty. *Id.* (quoting *Terry v. Ohio,* 392 U.S. 1, 39, 88 S. Ct. 1868, 1889, 20 L. Ed. 2d 889, 916 (1968) (Douglas, J., dissenting)). In short, dissenters were concerned that the narrow but deep Fourth Amendment regime established by *Boyd* and *Olmstead* would be replaced by a broad but shallow Fourth Amendment doctrine based on ephemeral notions of privacy.

A close reading of *Katz,* however, indicates that the majority of the United States Supreme Court did not abandon a property-rights theory, but instead added a component of privacy onto existing Fourth Amendment doctrine. The majority opinion states that "the Fourth Amendment governs not only the seizure of tangible items, but extends as well to the recording of oral statements" overheard without a physical trespass under local property law. *Katz,* 389 U.S. at 353, 88 S. Ct. at

512, 19 L. Ed. 2d at 583.  Thus, Justice Stewart's majority opinion does not overthrow the prior regime but grafts a privacy branch onto existing doctrine.  *See id.*

Notwithstanding the incremental nature of the majority opinion, Justice Harlan's stylish concurring opinion regarding legitimate expectations of privacy captured the most attention in the aftermath of *Katz.  See id.* at 360–62, 88 S. Ct. at 516–17, 19 L. Ed. 2d at 587–88 (Harlan, J., concurring); *see generally* Clancy, *Fourth Amendment* at 59–60.  Over time, however, some Supreme Court cases, explicitly or implicitly recognizing older property-based notions that were not discarded in *Katz,* began to reappear.[8]  In particular, Supreme Court cases have repeatedly emphasized the special status of the home in Fourth Amendment context, noting that physical entry into the home was the "chief evil against which the wording of the Fourth Amendment is directed."  *See United States v. United States Dist. Ct.,* 407 U.S. 297, 313, 92 S. Ct. 2125, 2134, 32 L. Ed. 2d 752, 764 (1972); *see also Kyllo v. United States,* 533 U.S. 27, 37–38, 121 S. Ct. 2038, 2045, 150 L. Ed. 2d 94, 104–05 (2001) (holding that the entire "area" of the home is safe from prying eyes, regardless of whether the search uncovers "intimate details"); *Welsh v. Wisconsin,* 466 U.S. 740, 750, 104 S. Ct. 2091, 2098, 80 L. Ed. 2d 732, 743 (1984) ("Before agents of the government may invade the sanctity of the home, the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to *all* warrantless home entries."

_____

[8]As noted by Professor Amsterdam, even Justice Harlan himself in a later opinion recognized that the Fourth Amendment analysis " 'must . . . transcend . . . subjective expectations.' "  *See* Anthony G. Amsterdam, *Perspectives on the Fourth Amendment,* 58 Minn. L. Rev. 349, 384, 460 n.345 (1974) (quoting *United States v. White,* 401 U.S. 745, 786, 91 S. Ct. 1122, 1143, 28 L. Ed. 2d 453, 478 (1971) (Harlan, J., dissenting)).

(Emphasis added.)); *Payton v. New York*, 445 U.S. 573, 590, 100 S. Ct. 1371, 1382, 63 L. Ed. 2d 639, 653 (1980) (noting that the "Fourth Amendment has drawn a firm line at the entrance to the house").

There is also a filament of an interest in security running through some Fourth Amendment cases, particularly those involving seizures of an individual. But the concept of security runs through both "searches" and "seizures." For example, in *Terry*, the Court noted "the right of personal security belongs as much to the citizen on the streets of our cities as to the homeowner closeted in his study." *Terry*, 392 U.S. at 8–9, 88 S. Ct. at 1873, 20 L. Ed. 2d at 898. According to Professor Clancy, there may be a broad underlay of the concept of security in the Supreme Court's Fourth Amendment cases:

> [A]lthough often unstated in Supreme Court opinions, the essential attribute of the right to be secure is the ability of the individual to exclude the government from unreasonably searching or seizing one's person, house, papers, and effects. Without the ability to exclude, a person has no security. With the ability to exclude, a person has all that the Fourth Amendment promises: protection against unjustified intrusions by government.

Clancy, *Fourth Amendment* at 47.

The approaches of the above cases reveal that although the modern Supreme Court has tended to emphasize legitimate expectations of privacy, there seems to be at least a residuum of property-based or security-based notions at the core of Fourth Amendment protections. If the Fourth Amendment solely protected legitimate expectations of privacy, political branches of government could eviscerate the Fourth Amendment by broadly announcing that the government intended to engage in general searches. A person familiar with such a government proclamation may no longer reasonably expect to be free from government intrusion. The protections of the Fourth Amendment,

however, cannot depend solely upon the status of state law; otherwise, it could be effectively repealed by ordinary legislation or executive action. *Cf. Almeida-Sanchez v. United States*, 413 U.S. 266, 272, 93 S. Ct. 2535, 2539, 37 L. Ed. 2d 596, 602 (1973) (stating that "no Act of Congress can authorize a violation of the Constitution").

Whether the interests protected by the Fourth Amendment are characterized as privacy, property, security, or a combination of them, it is clear that under some circumstances, that interest may be invaded by the state upon an adequate showing and compliance with proper procedure. However interpreted, the Fourth Amendment is not an absolute bar to searches and seizures. Instead, the question often amounts to what showing must be made in any particular context to constitutionally justify a search.

2. *Reasonable searches under the Fourth Amendment.* On its face, the language of the Fourth Amendment Warrant Clause authorizes searches and seizures based on probable cause and supported by particularity. *See* U.S. Const. amend. IV. Justice Stewart relied upon this language in staunchly advocating what might be termed the warrant-preference rule. *See generally* William W. Greenhalgh & Mark J. Yost, *In Defense of the "Per Se" Rule: Justice Stewart's Struggle to Preserve the Fourth Amendment's Warrant Clause*, 31 Am. Crim. L. Rev. 1013 (1994). Under this approach, the Reasonableness Clause and the Warrant Clause of the Fourth Amendment are intertwined. A search conducted pursuant to a warrant with probable cause is reasonable, and only in exceptional circumstances in which it would be impractical or unreasonable for the government to obtain a warrant could a warrantless search be considered reasonable. *Id.* at 1016. The warrant-preference rule was firmly embraced by the Supreme Court in the period between

1950 and 1990 in cases emphasizing that a search or seizure is per se invalid if not obtained through the warrant process. *See, e.g.*, *California v. Acevedo*, 500 U.S. 565, 580, 111 S. Ct. 1982, 1991, 114 L. Ed. 2d 619, 634 (1991); *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55, 91 S. Ct. 2022, 2032, 29 L. Ed. 2d 564, 576 (1971); *Katz*, 389 U.S. at 356–57, 88 S. Ct. at 514, 19 L. Ed. 2d at 585.

While some exceptions to the warrant requirement—such as searches of maritime vessels and searches incident to arrest—have long been recognized, the Supreme Court has from time to time indicated that the exceptions to the warrant requirement should be "jealously and carefully drawn." *Jones v. United States*, 357 U.S. 493, 499, 78 S. Ct. 1253, 1257, 2 L. Ed. 2d 1514, 1519 (1958). The Court further emphasized that there must be a "showing by those who seek [the exception] that the exigencies of the situation made that course imperative." *McDonald v. United States*, 335 U.S. 451, 456, 69 S. Ct. 191, 193, 93 L. Ed. 153, 158 (1948).

The notion that ordinarily searches required warrants based on probable cause except for tightly controlled exceptions ran into difficulty with the expansion of interests protected by the Fourth Amendment. When the Supreme Court expanded the reach of the Fourth Amendment to include a broad category of privacy interests, the Supreme Court in a series of cases came to the conclusion that a traditional probable cause-based warrant seemed impractical. As a result, the Supreme Court began to expand the number of and scope of exceptions to the warrant requirement. Exceptions to the warrant requirement now go well beyond those recognized at the time of the enactment of the Fourth Amendment and include consent searches, *Schneckloth v. Bustamonte*, 412 U.S. 218, 222–23, 93 S. Ct. 2041, 2045, 36 L. Ed. 2d 854, 860 (1973),

investigatory detentions, *Terry*, 392 U.S. at 27, 88 S. Ct. at 1883, 20 L. Ed. 2d at 909, and an increasingly broad category of administrative searches and special needs exceptions, *Camara*, 387 U.S. at 536–38, 87 S. Ct. at 1735, 18 L. Ed. 2d at 940–41.

In cases where a search is required to be conducted pursuant to a warrant, probable cause remains required. When a search may be conducted without a warrant, however, the question arises what kind of showing is required before a warrantless search may be considered "reasonable." Specifically, the question arises whether some kind of particularity or some kind of showing is required before a warrantless search may be conducted.

3. *"Reasonableness" and "special needs" under the Fourth Amendment.* The traditional exceptions to the warrant requirement were based on the view that it would be impractical under the circumstances to obtain a warrant. In these cases, however, the requirement of probable cause remained intact. Thus, under the search-incident-to-arrest, exigent-circumstances, and automobile exceptions, probable cause remained part of the analysis.

As the Supreme Court expanded the scope of the Fourth Amendment, however, it not only relaxed the warrant requirement, but also the particularity requirement of probable cause. In the seminal case of *Camara*, the Supreme Court considered whether municipal housing inspectors could conduct housing inspections without possessing probable cause to believe that a particular dwelling contained code violations. *Camara*, 387 U.S. at 525, 87 S. Ct. at 1728–29, 18 L. Ed. 2d at 933. The Court in *Camara* concluded that "probable cause" for a search of a particular dwelling existed if reasonable legislative or administrative standards for conducting the search of houses in a

general area were satisfied. *Id.* at 538, 87 S. Ct. at 1735–36, 18 L. Ed. 2d at 940–41. The Court noted that the "primary governmental interest at stake is to prevent even the unintentional development of conditions which are hazardous to public health and safety." *Id.* at 535, 87 S. Ct. at 1734, 18 L. Ed. 2d at 939. The point of the inspection was building safety, not "discovery of evidence of crime." *Id.* at 537, 87 S. Ct. at 1735, 18 L. Ed. 2d at 940.

The *Camara* framework, as elaborated in subsequent cases, established what has come to be known as the "special needs" exception to the warrant and probable cause requirements. Instead of applying the ordinary Fourth Amendment rule, which requires that a search be based on individualized suspicion of wrongdoing, the Court has found a series of limited exceptions based on "special needs, beyond the normal need for law enforcement, mak[ing] the [traditional] warrant and probable cause requirement impracticable." *New Jersey v. T.L.O.*, 469 U.S. 325, 351, 105 S. Ct. 733, 748, 83 L. Ed. 2d 720, 741 (1985) (Blackmun, J., concurring).

The special needs exception as developed by the United States Supreme Court is supported by the view that the warrant requirement and its probable cause standard are " 'peculiarly related to criminal investigations.' " *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 667, 109 S. Ct. 1384, 1392, 103 L. Ed. 2d 685, 703 (1989) (quoting *Colorado v. Bertine*, 479 U.S. 367, 371, 107 S. Ct. 738, 741, 93 L. Ed. 2d 739, 745 (1987)). The Supreme Court has held that "in certain limited circumstances" such as discovery of employee drug use, "the Government's need to discover . . . latent or hidden conditions, or to prevent their development, is sufficiently compelling to justify the intrusion on privacy entailed by conducting . . . searches without any

measure of individualized suspicion." *Id.* at 668, 109 S. Ct. at 1392, 103 L. Ed. 2d at 704.

Distinguishing between cases involving special needs not related to general law enforcement and cases involving enforcement of criminal law is not always as easy as the fact scenario presented in *Camara.* The special needs exception that brushes closest to criminal law enforcement is found in four cases involving drug testing. In these cases, however, a special need arose because of concerns about workplace or school safety. *Bd. of Educ. v. Earls*, 536 U.S. 822, 834, 122 S. Ct. 2559, 2567, 153 L. Ed. 2d 735, 747 (2002); *Veronica Sch. Dist. v. Acton,* 515 U.S. 646, 661–62, 115 S. Ct. 2386, 2395, 132 L. Ed. 2d 564, 579–80 (1995); *Nat'l Treasury Employees Union,* 489 U.S. at 666, 109 S. Ct. at 1391, 103 L. Ed. 2d at 702; *Skinner v. Ry. Labor Executives Ass'n*, 489 U.S. 602, 631, 109 S. Ct. 1402, 1420, 103 L. Ed. 2d 639, 668–69 (1989). The special needs doctrine also sometimes abuts criminal law when law enforcement officers are involved in traffic stops. *Mich. Dep't of State Police v. Sitz,* 496 U.S. 444, 451, 110 S. Ct. 2481, 2485–86, 110 L. Ed. 2d 412, 420–21 (1990) (holding sobriety checkpoints to involve special need of highway safety notwithstanding general law enforcement interest in apprehending drunk drivers).

In cases with both criminal and noncriminal implications, the Supreme Court has the task of drawing the line between cases where the criminal aspect predominates and cases where the primary goal of the government activity is noncriminal in nature. For example, in *City of Indianapolis v. Edmond,* 531 U.S. 32, 121 S. Ct. 447, 148 L. Ed. 2d 333 (2000), the Court considered the constitutionality of seizing motorists at fixed checkpoints to enable drug sniffing dogs to detect criminal activity. *Edmond,* 531 U.S. at 36, 121 S. Ct. at 451, 148 L. Ed. 2d at 339–40. In

*Edmond,* the Supreme Court held that individualized suspicion was required. *Id.* at 44, 121 S. Ct. at 455, 148 L. Ed. 2d at 345. Similarly, in *Ferguson v. City of Charleston,* 532 U.S. 67, 121 S. Ct. 1281, 149 L. Ed. 2d 205 (2001), the Court considered whether a hospital policy whereby drug tests of pregnant women were routinely turned over to police for referral to treatment or criminal prosecution passed constitutional muster. *Ferguson,* 532 U.S. at 70, 121 S. Ct. at 1284, 149 L. Ed. 2d at 211–12. In *Ferguson,* the Court held the program violated the Fourth Amendment, stressing that the general interest in crime control was the main motivating factor behind the program. *Id.* at 82–84, 121 S. Ct. at 1291–92, 149 L. Ed. 2d at 219–20. The *Ferguson* Court emphasized that "the gravity of the threat alone cannot be dispositive of questions concerning what means law enforcement may employ to pursue a given purpose." *Id.* at 86, 121 S. Ct. at 1293, 149 L. Ed. 2d at 221 (quoting *Edmond,* 531 U.S. at 42, 121 S. Ct. at 455, 148 L. Ed. 2d at 344).

It is apparent that beginning with *Camara,* the traditional notion that a warrant was ordinarily required for a valid search, subject to a few narrow exceptions, was being applied in a fashion more favorable to warrantless government searches. Yet, there remained a view, even in the less demanding special needs cases of the Supreme Court, that some control on law enforcement discretion was required to satisfy Fourth Amendment concerns. The means of limiting discretion could include preestablished neutral criteria that controlled the arbitrary exercise of governmental power as in *Camara,* or an *Edmond*-type particularity requirement that restrained the government from engaging in totally baseless searches.

4. *Application of Fourth Amendment search and seizure principles to cases involving prisoners, probationers, and parolees.* The United

States Supreme Court has had several relatively recent occasions to consider the Fourth Amendment rights of prisoners. The first case was *Hudson v. Palmer*, 468 U.S. 517, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984). In that case, a five-to-four majority of the Supreme Court held that a prisoner did not have a privacy interest protected by the Fourth Amendment in his prison cell. *Hudson*, 468 U.S. at 525–26, 104 S. Ct. at 3200, 82 L. Ed. 2d at 402–03. The five member Supreme Court majority reasoned that the need to ensure the safety of prison staff and visitors and the need to detect escape plots, drugs, and weapons prevented application of Fourth Amendment restrictions in the prison setting. *Id.* at 526–29, 104 S. Ct. at 3200–02, 82 L. Ed. 2d at 403–05.

Three years later, the Supreme Court considered the Fourth Amendment rights of probationers in *Griffin v. Wisconsin*, 483 U.S. 868, 107 S. Ct. 3164, 97 L. Ed. 2d 709 (1987). In *Griffin*, a five-to-four majority of the Supreme Court upheld the validity of a search of a probationer's home by a probation officer without a warrant pursuant to a regulation that required reasonable grounds to believe that contraband was present before a warrantless search was conducted. *Griffin*, 483 U.S. at 875–76, 107 S. Ct. at 3169–70, 97 L. Ed. 2d at 718–19. The majority held that there are special needs in the probation system beyond the normal needs of law enforcement and that those special needs made proceeding without a warrant "reasonable." *Id.* at 876–77, 107 S. Ct. at 3169–70, 97 L. Ed. 2d at 719–20. In the probation setting, a delay inherent in obtaining a warrant would make it more difficult for probation officers to respond quickly to evidence of misconduct and reduce the deterrent effect of the probation system. *Id.*

In addition, the *Griffin* majority emphasized the difference between a search conducted by a probation officer and a search conducted by a

police officer. *Id.* The *Griffin* Court declared that a probation officer, unlike a general law enforcement officer, had the interest of the probationer in mind. *Id.* The probationer is even referred to as a "client" of the probation officer. *Id.* Thus, a search based upon reasonable suspicion was acceptable in *Griffin* because the risk of overreaching when the search was conducted by a probation officer was less than when the search was conducted by a police officer, whose only mission was to ferret out crime. *See id.* at 876–79, 107 S. Ct. at 3170–71, 97 L. Ed. 2d at 719–21.

The Supreme Court returned to the Fourth Amendment rights of probationers in *United States v. Knights*, 534 U.S. 112, 122 S. Ct. 587, 151 L. Ed. 2d 497 (2001). In *Knights*, the defendant received probation for a drug offense. *Knights*, 534 U.S. at 114, 112 S. Ct. at 589, 151 L. Ed. 2d at 502. The probation order contained a "search condition" stating that Knights would " '[s]ubmit his . . . person, property, place of residence, vehicle, personal effects, to search at anytime, with or without a search warrant, warrant of arrest or reasonable cause by any probation officer or law enforcement officer.' " *Id.* (quoting probation order). Knights signed a stipulation acknowledging receipt of the probation agreement, agreeing that he both understood the terms and conditions, and that he would abide by them. *Id.* Three days later, authorities searched Knights' residence as part of an arson investigation. *Id.* at 114–15, 122 S. Ct. at 589, 151 L. Ed. 2d at 502–03.

The United States Supreme Court upheld the search. The *Knights* Court rejected the notion that the Fourth Amendment permits only "probationary" searches and not "investigatory" searches of probationers. *Id.* at 117–18, 122 S. Ct. at 590–91, 151 L. Ed. 2d at 504. In upholding the search, the Court explained that the probation condition

"significantly diminished Knights' reasonable expectation of privacy." *Id.* at 119–20, 122 S. Ct. at 592, 151 L. Ed. 2d at 505. Given the reduced expectation of privacy, a search based on reasonable suspicion, even by a police officer, was permissible. *Id.* at 121, 122 S. Ct. at 592, 151 L. Ed. 2d at 506.

The *Knights* Court did not address the issue of whether a probation or parole condition of release can so diminish or eliminate a person's reasonable expectation of privacy that a *suspicionless* search may be conducted without violating the Fourth Amendment. Following *Knights*, a number of circuit courts applied the reasonable suspicion test in the context of parolees. *See, e.g.*, *United States v. Williams*, 417 F.3d 373, 376 n.1 (3d Cir. 2005); *Knox v. Smith*, 342 F.3d 651, 657 (7th Cir. 2003); *United States v. Loney*, 331 F.3d 516, 520–21 (6th Cir. 2003); *United States v. Tucker*, 305 F.3d 1193, 1199 (10th Cir. 2002).

Following *Knights*, the United States Supreme Court addressed the scope of Fourth Amendment protection of parolees in *Samson v. California*, 547 U.S. 843, 126 S. Ct. 2193, 165 L. Ed. 2d 250 (2006). In *Samson,* Samson, a recent parolee, was stopped while walking down a street by an officer who knew of Samson's parolee status. *Samson*, 547 U.S. at 846, 126 S. Ct. at 2196, 165 L. Ed. 2d at 255. The officer proceeded to search Samson based solely upon Samson's status as a parolee. *Id.* at 846–47, 126 S. Ct. at 2196, 165 L. Ed. 2d at 255–56. The officer found a cigarette box in Samson's left breast pocket that contained a plastic bag filled with methamphetamine. *Id.*

In *Samson*, the search was authorized by a state statute. *Id.* The state statute provided, in relevant part, that every prisoner eligible for release on parole "shall agree in writing to be subject to search or seizure by a parole officer or other peace officer at any time of the day or night,

with or without a search warrant and with or without cause." *Id.* at 846, 126 S. Ct. at 2196, 165 L. Ed. 2d at 255; *see also* Cal. Penal Code § 3067(a) (West 2000).

In determining the validity of the search, the *Samson* Court employed a totality-of-the-circumstances test under which the degree a search intrudes upon an individual's privacy interests is weighed against the degree to which the search promotes legitimate government interests. *Id.* at 848, 126 S. Ct. at 2197, 165 L. Ed. 2d at 256. In determining the weight of a released prisoner's privacy interest, the *Samson* Court employed a "spectrum of rights" doctrine. Under this doctrine, prisoners, parolees, and probationers exist on a continuum in which one's legitimate expectation of privacy positively correlates with the intensity of the state-imposed punishment. *Id.* at 850, 126 S. Ct. at 2198, 165 L. Ed. 2d at 258. Although parolees have some expectation of privacy, that expectation is greatly diminished because parole is akin to imprisonment. *Id.* A probationer, on the other hand, has a greater interest in privacy because probation is usually imposed in lieu of, and not in addition to, imprisonment. *Id.*

Where a parolee is involved, the Court held that a state had a substantial interest in supervising parolees who were likely to commit future crimes and to conceal the evidence of criminal enterprises because they face increased punishment if apprehended. *See id.* at 853, 126 S. Ct. at 2200, 165 L. Ed. 2d at 260. The Court seemed to narrow its holding somewhat, however, noting that the reasonableness of the search may turn on the state law under which the search was authorized. *Id.* at 855–57, 126 S. Ct. at 2201–02, 165 L. Ed. 2d at 261–62.

Justice Stevens, joined by Justices Souter and Breyer, filed a vigorous dissent in *Samson.* *See id.* at 857, 126 S. Ct. at 2202, 165

L. Ed. 2d at 262–63 (Stevens, J., dissenting). The dissent recognized that prior cases of the Court embraced the notion that probationers have a less robust expectation of privacy than ordinary citizens that might justify warrantless searches upon reasonable suspicion of wrongdoing. *Id.* The dissenters further noted that probation officers who are responsible for providing individualized counseling to their charges may have special needs justifying departures from Fourth Amendment strictures. *Id.* The dissenters were unwilling, however, to embrace "a regime of suspicionless searches, conducted pursuant to a blanket grant of discretion untethered by any procedural safeguards, by law enforcement personnel who have no special interest in the welfare of the parolee or probationer." *Id.* Such a regime was characterized by the dissent as "an unprecedented curtailment of liberty." *Id.*

Justice Stevens attacked the *Samson* majority for, in effect, treating parolees for all practical purposes like prisoners, without recognizing the fundamental distinctions between the two. *Id.* at 861–62, 126 S. Ct. at 2204–05, 165 L. Ed. 2d at 265–66. While Justice Stevens acknowledged that parolees generally may be responsible for more serious crimes than probationers, and that parolees by definition had served a prison term, these distinctions did not support a lower expectation of privacy on the part of parolees upon release. *Id.*

Justice Stevens noted that a term and condition of release might be a basis for supporting a warrantless search by a parole officer under either the special needs doctrine or because at least part of the requisite "reasonable suspicion" is supplied by "individual-specific" knowledge gained in the supervisory relationship. *Id.* at 864–65, 126 S. Ct. at 2207, 165 L. Ed. 2d at 267–68. Further, Justice Stevens recognized that the Court, in lieu of individualized suspicion, had on occasion relied upon

"programmatic safeguards to ensure evenhandedness." *Id.* But Justice Stevens rejected "the search condition . . . imposed on *all* parolees— whatever the nature of their crimes, whatever their likelihood of recidivism, and whatever their supervisory needs—without any programmatic procedural protections." *Id.* (emphasis in original).

Because of *Samson*'s recent vintage, federal case law in the wake of *Samson* is relatively undeveloped. A number of federal appellate courts have applied *Samson* to warrantless, suspicionless searches of parolees based on language in a parole agreement or even in an orientation video in the absence of specific statutory authorization. *United States v. Pickens*, 295 Fed. App'x 556, 558 (4th Cir. 2008) (parole agreement); *United States v. Smith*, 526 F.3d 306, 310–11 (6th Cir. 2008) (orientation video); *United States v. Massey*, 461 F.3d 177, 179 (2d Cir. 2006) (parole agreement).

At least one federal court, however, has taken a narrow view of *Samson.* The Tenth Circuit has held that the *Samson* search was permissible only because it was authorized by state law. *United States v. Freeman*, 479 F.3d 743, 747–48 (10th Cir. 2007). Without an underlying state statute, according to *Freeman*, the rule in *Samson* did not apply. *Id.* at 748.

**E. Discussion of State Appellate Court Search and Seizure Precedents Dealing with Searches of Parolee Homes.** Prior to *Samson*, there was not a large body of state constitutional law regarding the showing that must be made to justify a search of a parolee's home. Some states that considered the question required at least some showing of reasonable suspicion to conduct searches of parolees. For example, the Alaska Supreme Court, relying on its state constitution, declared that there must be some particularized showing before a search of a parolee

occurred. *See Roman v. State*, 570 P.2d 1235, 1243 n.26, 1244 (Alaska 1977). A number of other state appellate courts came to similar conclusions. *People v. Anderson*, 536 P.2d 302, 305 (Colo. 1975), *superseded by statute*, Colo. Rev. Stat. § 17-2-201, *as recognized in People v. McCullough*, 6 P.3d 774, 777–78 (Colo. 2000); *State v. Fogarty*, 610 P.2d 140, 144 (Mont. 1980), *overruled by State v. Burke*, 766 P.2d 254, 257–58 (Mont. 1988); *Tamez v. State*, 534 S.W.2d 686, 692 (Tex. Crim. App. 1976); *State v. Velasquez*, 672 P.2d 1254, 1260 (Utah 1983).

Some state courts, however, have upheld suspicionless searches of parolees on a constructive custody theory. For instance, in *People v. Hernandez*, 40 Cal. Rptr. 100, 103–04 (Ct. App. 1964), a California appellate court upheld a suspicionless search of a parolee, reasoning that although the parolee was physically outside the prison walls, he still was constructively a prisoner and thus had no Fourth Amendment rights. A number of state cases have adopted this approach, usually without analysis. *McFerrin v. State*, 42 S.W.3d 529, 534–35 (Ark. 2001); *State v. Williams*, 486 S.W.2d 468, 473 (Mo. 1972); *People v. Santos*, 298 N.Y.S.2d 526, 528 (App. Div.), *aff'd*, 252 N.E.2d 861 (N.Y. 1969).

The constructive custody approach has been characterized by commentators as a legal fiction that fails to account for the dramatic differences in conditions between life in prison and life on parole. *See, e.g.*, William R. Rapson, Note, *Extending Search-and-Seizure Protection to Parolees in California*, 22 Stan. L. Rev. 129, 133 (1969) [hereinafter Rapson]. Professor LaFave criticizes the constructive custody concept as more of a conclusion than a theory. *See* 5 Wayne R. LaFave, *Search & Seizure* § 10.10(a), at 435 (4th ed. 2004). He also notes, among other things, that the life of a parolee more nearly resembles that of an ordinary citizen than a prisoner. *See id.* at 436 (citing Rapson, 22 Stan.

L. Rev. at 133); *see also* Welsh S. White*, The Fourth Amendment Rights of Parolees and Probationers*, 31 U. Pitt. L. Rev. 167, 180–81 (1969) [hereinafter White].

There has not been a significant body of state constitutional law dealing with the search and seizure of parolees after *Samson.* Several cases, however, have followed *Samson.* Two state supreme courts have declined to depart from *Samson* in interpreting their state constitutions. *See State v. Bartylla*, 755 N.W.2d 8, 18–19 (Minn. 2008); *State v. Turner*, 297 S.W.3d 155, 165–66 (Tenn. 2009). We have found no other state supreme court opinion since *Samson* which has squarely considered whether to depart from *Samson* under a parallel provision of the state constitution.

**F. Search and Seizure Precedents Under the Iowa Constitution.**

1. *Overview of approach to article I, section 8 of the Iowa Constitution.* As indicated above, there have been very few cases in which we have engaged in an independent consideration of search and seizure issues under the Iowa Constitution. Further, because of ambiguity in our opinions with respect to the basis of the underlying claim, it is not often clear whether state constitutional grounds are implicated.

In any event, it may be said generally that our search and seizure case law historically has reflected considerable solicitude to the sanctity of the home.[9] Our early cases emphasized the security of the home.

---

[9]This case involves the intrusion by a general law enforcement officer into a motel room in which Ochoa resided. It is well established that a resident of a motel room enjoys similar search and seizure protections as one residing in a house. *See State v. Brooks*, 760 N.W.2d 197, 204–05 (Iowa 2009) ("The Fourth Amendment unquestionably establishes an expectation of privacy in the home. The case law extends this protection to hotel or motel rooms."); *see also Hoffa v. United States*, 385

*See, e.g., McClurg v. Brenton*, 123 Iowa 368, 371, 98 N.W. 881, 882 (1904); *State v. Sheridan*, 121 Iowa 164, 167, 96 N.W. 730, 731 (1903). We have declared that the right of officers to thrust themselves into the home is a matter of "grave concern." *State v. Brant*, 260 Iowa 758, 763, 150 N.W.2d 621, 625 (1967). We have generally maintained that a "search warrant issued by a neutral magistrate is required before a private residence may be searched unless a valid consent to the search and entry . . . has been given to the police." *State v. Jones*, 274 N.W.2d 273, 275 (Iowa 1979). Citing contemporaneous United States Supreme Court cases, we have characterized the security of one's home against arbitrary intrusion by the police as "at the core of the [F]ourth [A]mendment and basic to our society." *State v. Ahart*, 324 N.W.2d 317, 319 (Iowa 1982); *see also State v. Reinier*, 628 N.W.2d 460, 464 (Iowa 2001) (cataloguing and approving of United States Supreme Court cases emphasizing that the sanctity of the home is central to the meaning of the Fourth Amendment).

We have also generally endorsed the warrant-preference requirement. We have repeatedly stated that warrantless searches and seizures that did not fall within one of the "jealously and carefully drawn exceptions" are unreasonable. *See State v. Strong*, 493 N.W.2d 834, 836 (Iowa 1992); *State v. Sanders*, 312 N.W.2d 534, 538 (Iowa 1981). These cases, however, were no doubt influenced by prevailing jurisprudence of the United States Supreme Court, which has now generally tended to move away from the warrant and probable cause requirement in many contexts.

---

U.S. 293, 301, 87 S. Ct. 408, 413, 17 L. Ed. 2d 374, 381 (1966) ("A hotel room can clearly be the object of Fourth Amendment protection as much as a home . . . .").

In the search and seizure area, we decided one important case on independent state grounds in *Cline*, 617 N.W.2d at 278. In that case, we declined to follow the lead of the United States Supreme Court by rejecting a good faith exception to the exclusionary rule in search and seizure cases under article I, section 8. *See Cline*, 617 N.W.2d at 292–93; *see also United States v. Leon*, 468 U.S. 897, 922, 104 S. Ct. 3405, 3420, 82 L. Ed. 2d 677, 698 (1984) (creating the good faith exception). In *Cline*, we noted that the recent cases of the United States Supreme Court tended to undermine the exclusionary rule, but we declined to adopt that approach. *Cline*, 617 N.W.2d at 284, 292–93. We found that the reasoning of the United States Supreme Court in *Leon* was insufficient to justify a similar approach under the Iowa Constitution. *Id.* at 288–92.

2. *Application of search and seizure principles to cases involving prisoners, probationers, and parolees.* In *Cullison*, this court considered the protections of a parolee against government searches and seizures. *Cullison*, 173 N.W.2d at 535. In *Cullison*, a parolee allowed his parole officer to enter his apartment. *Id.* at 535. Upon entry, the parole officer discovered a locked interior door and demanded access. *Id.* The parolee refused. *Id.* His suspicions aroused, the parole officer sought and obtained the assistance of a law enforcement officer to search, without a warrant, the locked room. *Id.* The warrantless search uncovered stolen merchandise, and the State charged the parolee with receiving stolen property. *Id.*

The *Cullison* court began its discussion by canvassing case law in other jurisdictions addressing the scope of parolee rights in the context of searches by law enforcement officers. *Id.* at 535–37. The court identified three strands in the case law: (1) cases that strip parolees of

all Fourth Amendment rights, (2) cases that dilute parolees' Fourth Amendment rights, and (3) cases that afford a parolee full Fourth Amendment protections. *Id.* at 536. Rejecting the stripping and diluting approaches, the majority held that a parolee is afforded the same rights as any other person under the Fourth Amendment. *Id.* at 537. The court supported its holding, in part, by noting that article II, section 5 of the Iowa Constitution provides that only persons convicted of infamous crimes are deprived of any constitutional right, and then only of the right to vote. *Id.* at 537–38.

The present case, however, may arguably be distinguished from *Cullison* because, in *Cullison*, the parole agreement signed by the parolee had only required him to "conduct himself honestly, obey the law, keep reasonable hours, refrain from excessive use of intoxicants, and remain at all times in Montgomery County." *Id.* at 534. Unlike this case, it did not contain any language that purported to waive constitutional rights.

Four members of the *Cullison* court dissented. A dissent by Justice Larson emphasized that the parole officer was performing his duties to oversee and supervise the parolee and had reason to suspect criminal activity might be afoot. *Cullison*, 173 N.W.2d at 542 (Larson, J., dissenting). Justice Larson noted that

> a parolee has a special status not identical with other persons, that a parole agent or supervisor has not only the right but the duty to conduct a search of the parolee's premises when he has reason to believe the parolee has been engaged in activities violative of his parole.

*Id.* at 543–44. In a separate dissent, Justice Stuart stated that the search of a parolee's home by a parole officer in the discharge of his duties of supervision, surveillance, and control is an exception to the warrant requirement. *Id.* at 544 (Stuart, J., dissenting).

Even under the dissents in *Cullison*, however, it is not clear that the State would be entitled to prevail in this case. In *Cullison*, the parole officer was engaged in his duty of supervising a parolee. *See id.* at 535. Thus, *Cullison* rejected the "special needs" approach to parolees with respect to searches by parole officers. *See id.* at 537. In this case, no such special needs are implicated as the searching officer was not acting as a parole officer, but was engaged in general law enforcement activities. The police officer's search related to new crimes having no direct connection with Ochoa's prior convictions.

**G. Academic Commentary on the *Samson* Approach.** Academic commentary has generally been hostile to *Samson* and the departure of particularized suspicion. A raft of student notes takes the position that *Samson* spun the wheels off of the Fourth Amendment. *See, e.g.,* Robert Cacace, Recent Development, Samson v. California*: Tearing Down a Pillar of Fourth Amendment Protections*, 42 Harv. C.R.-C.L. L. Rev. 223, 229–33 (2007) (stating that *Samson* confuses the reasonableness test with the special needs test, thereby undermining Fourth Amendment rights); John Lassetter, Article, Samson v. California*: "Evil" Suspicionless Searches Become a Part of Everyday Life for Parolees*, 25 Law & Ineq. 539, 554–55 (2007) (rejecting balancing test utilized by *Samson* and asserting that suspicionless searches of parolees are not reasonable); Rachael A. Lynch, Note, *Two Wrongs Don't Make a Fourth Amendment Right:* Samson *Court Errs in Choosing Proper Analytical Framework, Errs in Result, Parolees Lose Fourth Amendment Protection*, 41 Akron L. Rev. 651, 681–88 (2008) (stating *Samson* ignores important Fourth Amendment interests of parolees and overstates state interests); David M. Stout*,* Note, *Home Sweet Home?! Maybe Not for Parolees and Probationers When it Comes to Fourth Amendment Protection,* 95 Ky. L.J.

811, 838 (2007) (arguing warrantless, suspicionless searches have negative impact on offender reintegration with little gain).

Leading academic commentators agree. For example, Professor LaFave finds *Samson* unpersuasive, characterizing the move away from "special needs" analysis into a general reasonableness analysis as "especially troublesome." 5 Wayne R. LaFave, *Search & Seizure* § 10.10, at 44 (4th ed. Supp. 2010–2011).

## V. Analysis Under the Iowa Constitution.

To the extent Iowa search and seizure cases rely upon the Fourth Amendment, there is no question that the cases regarding the sanctity of the home express a preference for warrants and a requirement of particularity. There is also no question that this case law has been undermined by the United States Supreme Court decisions, including *Samson*, that favor a general reasonableness approach. As has been pointed out, *Samson* is part of a steady march in that direction. The question presented here is whether we should join in that steady march in our interpretation of the search and seizure provision of the Iowa Constitution or, as in *Cline*, go our separate way.

In considering the question, we could simply affirm *Cullison*, which held that the warrant and probable cause requirements of article I, section 8 are fully applicable to searches of parolees' homes. *Cullison*, 173 N.W.2d at 537. The argument would be based upon the notion that invasions of the home implicate interests that are at the very core of the Fourth Amendment and article I, section 8. In so holding, we would declare that a "reasonableness" analysis cannot be used as a back door to dilute the warrant and probable cause requirements. It could be argued that a constable walking a beat should not have more power to authorize a home search than a magistrate, who can issue a search

warrant only upon a showing of probable cause. We would, in essence, find that the facts of the case do not establish one of the "jealously and narrowly drawn" exceptions to the warrant requirement. It is not necessary to address the issue of whether a warrant and probable cause are required, however, because even under a reasonableness analysis, we conclude that the search in this case is invalid.

At the outset, we note the similarity between the State's position and the despised general warrant—a motivating factor in the Fourth Amendment's enactment. According to the State, the constable may search a parolee at any time, for anything, anywhere, including the home, without any suspicion of any kind. Under this construction, at least with respect to parolees, the police badge confers the "discretionary . . . search authority that general warrants had conferred in the eighteenth century." *See* Thomas Y. Davies, *Correcting Search-and-Seizure History: Now-Forgotten Common-Law Warrantless Arrest Standards and the Original Understanding of "Due Process of Law,"* 77 Miss. L.J. 1, 12 (2007). We regard this as the kind of unrestrained discretion that is "unreasonable" under article I, section 8.

The scope of the asserted power is stunningly broad. A person on parole for an alcohol-related crime, for instance, could be subject to warrantless searches of books, records, diaries, invoices, and intimate surroundings. The proposed invasion is not minimal and highly-defined as in *Terry*; nor is it closely-linked to an identified special need as in *National Treasury Employees Union* or *Skinner*. *See Nat'l Treasury Employees Union,* 489 U.S. at 669–71, 109 S. Ct. at 1392–93, 103 L. Ed. 2d at 704–05 (urine testing of employees to avoid corruption in the revenue service); *Skinner*, 489 U.S. at 623–24, 109 S. Ct. at 1416–17, 103 L. Ed. 2d at 663–64 (blood, urine, and breath testing for persons in

safety sensitive jobs); *Terry*, 392 U.S. at 29, 88 S. Ct. at 1884, 20 L. Ed. 2d at 910–11 (investigatory stops). The scope of the search in *Samson* thus is flatly contrary to the common-sense notion that "the scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." *Terry*, 392 U.S. at 19, 88 S. Ct. at 1878, 20 L. Ed. 2d at 904 (quoting *Hayden*, 387 U.S. at 310, 87 S. Ct. at 1652, 18 L. Ed. 2d at 794 (Fortas, J., concurring)). The scope of search authority in *Samson* reminds one of the search of Coke's premises and the seizure of his children's poem and his will; there are no limits to the scope of the search. *See* White, 31 U. Pitt. L. Rev. at 194 (comparing broad searches of parolees' dwelling places to general searches condemned by Otis).

Further, the rule in *Samson* applies to parolees who are above suspicion. *Samson*, 547 U.S. at 856–57, 126 S. Ct. at 2202, 165 L. Ed. 2d at 261–62. Even the lowest objective standard known under the law—reasonable suspicion—does not apply. *Id.* Ordinarily, the concept of individualized suspicion limits not only whether a search may be conducted, but also the scope of the search. Under *Samson*, however, a full search of the home does not even require an inarticulate hunch. *See id.*; *see also Delaware v. Prouse*, 440 U.S. 648, 661, 99 S. Ct. 1391, 1400, 59 L. Ed. 2d 660, 672 (1979) (expressing concern that permitting searches based upon mere hunches " 'would invite intrusions upon constitutionally guaranteed rights' " (quoting *Terry*, 392 U.S. at 22, 88 S. Ct. at 1880, 20 L. Ed. 2d at 906)). Such unbridled discretion has been labeled as the "evil" the Fourth Amendment, and by implication article I, section 8, was designed to avoid. *See Prouse*, 440 U.S. at 661, 99 S. Ct. at 1400, 59 L. Ed. 2d at 672; *see also Florida v. Wells*, 495 U.S. 1, 4, 110 S. Ct. 1632, 1635, 109 L. Ed. 2d 1, 6 (1990) (criticizing "uncanalized

discretion"); Thomas K. Clancy, *The Role of Individualized Suspicion in Assessing the Reasonableness of Searches and Seizures*, 25 U. Mem. L. Rev. 483, 488 (1995) (arguing individualized suspicion should be considered an inherent component of reasonableness); Taslitz at 45 (stating that the Fourth Amendment embraces individualized suspicion).

In some civil contexts, the existence of an administrative structure of programmatic restraints has provided a potential alternative to individualized suspicion. *See Camara*, 387 U.S. at 538, 87 S. Ct. at 1735–36, 18 L. Ed. 2d at 940–41. It is questionable whether such restraints against arbitrariness are sufficient in the context of general law enforcement activities. In any event, there are no such limitations in this case.

We further note that this case, like *Samson*, involves a search by a general law enforcement officer, and not by a parole officer. A properly limited, nonarbitrary warrantless search of the home by a parole officer *might* conceivably be supported under the "special needs" doctrine. As noted previously, under the special needs doctrine, warrantless searches to further goals *other than general law enforcement* have been upheld under certain facts and circumstances. *Nat'l Treasury Employees Union*, 489 U.S. at 666–68, 109 S. Ct. at 1391–92, 103 L. Ed. 2d at 703–04; *Griffin*, 483 U.S. at 880, 107 S. Ct. at 3172, 97 L. Ed. 2d at 722; *T.L.O.*, 469 U.S. at 344–47, 105 S. Ct. at 744–46, 83 L. Ed. 2d at 736–38. This case, however, does not involve a parole officer, but instead involves a general law enforcement officer. As a result, the special needs doctrine cannot support the warrantless and suspicionless search in this case.[10]

---

[10]The concurring opinion opines at length about the application of the special needs test to this case under the Iowa Constitution even though this issue is not before the court, has not been briefed by the parties, and is not illuminated by a complete factual record. In effect, the concurring opinion overrules *Cullison*, which holds that

We also are concerned about the categorical nature of the reasonableness test adopted by the United States Supreme Court in *Samson.* Under the approach in *Samson,* an overall assessment of reasonableness is based not on the particular facts of a case but on larger policies bolstered by the purported needs of law enforcement. We bristle at the replacement of a regime of individualized suspicion with broad categorical judgments when general law enforcement searches of the home are involved. We are reminded of the admonition of Justice Frankfurter years ago that one cannot wrench "unreasonable search" from its text and context into a stand-alone provision. *United States v. Rabinowitz,* 339 U.S. 56, 70, 70 S. Ct. 430, 436, 94 L. Ed. 653, 662 (1950) (Frankfurter, J., dissenting). The notion of particularity and limitations of the scope of searches are powerful elements of reasonableness.

Even assuming a role for balancing, we believe that the *Samson* approach undervalues the importance of a parolee's interest in the home. The home plays a central role in a person's life, providing sanctuary, comfort, seclusion, security, and identity. The sanctity of the home was a prominent part of the legal landscape in the *Wilkes* and *Paxton* cases and has been repeatedly emphasized by the United States Supreme Court. Invasions of the home by government officials cannot be regarded as constitutionally insignificant. As in the majority opinion in *Katz,* we find that the protection afforded by article I, section 8 extends beyond privacy and includes at least some notion of place and security. *See Katz,* 389 U.S. at 350, 353, 88 S. Ct. at 510, 512, 19 L. Ed. 2d at 581,

---

the warrant and probable cause requirements are fully applicable to searches of parolees' homes. We take a more restrained approach and decide only the issue before us rather than reach out and decide issues not necessary for the resolution of this case.

583 (noting that while the concept of "constitutionally protected areas" is not controlling, Fourth Amendment protections "go further, and often have nothing to do with privacy"); *see also* Clancy, *Fourth Amendment* at 47–48 (explaining that the "Fourth Amendment was a product of the eighteenth century's strong concern for the protection of real and personal property rights against arbitrary and general searches and seizures").

Indeed, to some extent, search and seizure protections must protect more than mere expectations of privacy if they are to have any bite at all. As Justice Stevens pointed out in his dissent in *Samson,* "if the Government were suddenly to announce on nationwide television that all homes henceforth would be subject to warrantless entry," it simply cannot be that the Fourth Amendment would no longer apply to searches of the home. *See Samson,* 547 U.S. at 863, 126 S. Ct. at 2206, 165 L. Ed. 2d at 266 (Stevens, J., dissenting) (quoting *Smith v. Maryland,* 442 U.S. 735, 741 n.5, 99 S. Ct. 2577, 2580 n.5, 61 L. Ed. 2d 220, 227 n.5 (1979)).

We also think *Samson* is fundamentally flawed by regarding a parolee as more akin to a prisoner than a probationer. It may be conceded that a prison " 'shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room.' " *Hudson,* 468 U.S. at 527, 104 S. Ct. at 3201, 82 L. Ed. 2d at 404 (quoting *Lanza,* 370 U.S. at 143, 82 S. Ct. at 1221, 8 L. Ed. 2d at 388). Yet, a parolee's home is nothing like a prison cell. Instead, it is indistinguishable from the home of any other citizen. As noted in *Morrissey v. Brewer,* 408 U.S. 471, 482, 92 S. Ct. 2593, 2601, 33 L. Ed. 2d 484, 495 (1972), the condition of a parolee is "very different from that of confinement in a prison."

An additional rationale in *Samson* is a claim that parolees in California have a greater recidivism rate than probationers and, as a result, should be treated differently for purposes of search and seizure analysis. *See Samson,* 547 U.S. at 853–54, 126 S. Ct. at 2200–01, 165 L. Ed. 2d at 260. There is reason to doubt, however, the empirical claim in *Samson* that parolees have a greater recidivism rate than probationers. If technical violations of parole are netted out, there is authority for the proposition that parolees and probationers have about the same recidivism rate. James M. Binnall, Commentary, *They Released Me from My Cage . . . But They Still Keep Me Handcuffed: A Parolee's Reaction to* Samson v. California, 4 Ohio St. J. Crim. L. 541, 543–44 (2007).

In any event, the basic premise is flawed. As noted by the Supreme Court in *Edmond,*

> [T]he gravity of the threat alone cannot be dispositive of questions concerning what means law enforcement officers may employ to pursue a given purpose. Rather, in determining whether individualized suspicion is required, [the Court] must consider the nature of the interests threatened and their connection to the particular law enforcement practices at issue.

*Edmond,* 531 U.S. at 42–43, 121 S. Ct. at 455, 148 L. Ed. 2d at 344; *see also Ferguson,* 532 U.S. at 86, 121 S. Ct. at 1293, 149 L. Ed. 2d at 221. In short, even when considering the public interest in preventing criminal violations, a search and seizure analysis should be precise and focused, not sweeping and sprawling with a one-size-fits-all approach.

We also reject the argument that a person released on parole has no more rights than if he were incarcerated because the state has the power to keep a person in prison. This argument, which can take the form of the "act of grace," "waiver," or "constructive custody" theory, was

firmly rejected in *Morrissey.* The *Morrissey* Court plainly rejected the "act of grace" and "waiver" theories by holding that constitutional rights do not turn on whether the government benefit involved is characterized as a right or privilege, even in the parole context. *Morrissey*, 408 U.S. at 481, 92 S. Ct. at 2600, 33 L. Ed. 2d at 494. The *Morrissey* Court also found that the constructive custody theory fails to provide a meaningful framework to assess parolees' constitutional rights. *See id.* at 483, 92 S. Ct. at 2601, 33 L. Ed. 2d at 495 ("Although the parolee is often formally described as being 'in custody,' the argument cannot even be made here that summary treatment is necessary as it may be with respect to controlling a large group of potentially disruptive prisoners in actual custody."). Commentators are also highly critical of the "act of grace," "waiver," and "constructive custody" theories. *See, e.g.*, 5 LaFave, *Search and Seizure*, § 10.10 (a)–(b), at 434–42 (4th ed. 2004) (concluding that "constructive custody," "act of grace," and "waiver theories" are erroneous). We do not believe these theories are sufficient to authorize the sweeping search powers embraced in *Samson.* Even though the State may have the power to imprison a parolee, the fact that a parolee is released into the larger community is the overriding factor for purposes of search and seizure analysis.

In sum, we reject the holding of *Samson* under the Iowa Constitution. We conclude that a parolee may not be subjected to broad, warrantless searches by a general law enforcement officer without any particularized suspicion or limitations to the scope of the search. The power asserted by the State in this case too closely resembles authority pursuant to a general warrant, provides no meaningful mechanism to control arbitrary searches, avoids the warrant preference rule that this court has traditionally recognized, utilizes a balancing test that

improperly weighs the interests involved, and does not adequately recognize the security and sanctity interests of parolees in their home. We have no occasion to consider other questions, such as (1) the potential application of special needs to searches of parolees conducted by *parole officers*; (2) whether individualized suspicion amounting to less than probable cause may be sufficient in some contexts to support a focused search; (3) whether means other than a warrant may be devised to limit arbitrary police power in connection with searches of parolees; or (4) whether a parolee's failure to consent to a search, or the discovery of a violation of parole pursuant to an invalid search, may justify parole revocation.

## VI. Consent.

There are potentially two separate consent issues in this case. The first issue is whether, by signing the parole agreement, Ochoa consented to the search. The second consent issue is whether Ochoa voluntarily consented to the search at the door of his motel room during his encounter with Hatler.

With respect to the issue of consent arising out of the parole agreement, the colloquy between the court and the State at the suppression hearing demonstrates that the State expressly declined to pursue this theory to support the search. The State conceded that the parole agreement did not waive constitutional rights in any blanket fashion, but instead simply provided a condition of parole. The State merely claimed at the hearing that the encounter at the door of Ochoa's motel room established voluntary consent to the search.

On appeal, however, the State engages in the proverbial switch of horses in midstream. The State on appeal declines to press the consent-at-the-door issue, but seeks to resurrect the claim abandoned at the trial

court, namely, that Ochoa consented to the search by virtue of his execution of the parole agreement. As a result of this procedural posture, a question arises as to whether the State has waived both the consent-by-agreement and the consent-at-the-door issues.

We consider first whether the State has waived the consent-by-agreement issue. The State conceded at the district court hearing that the parole agreement did not provide a basis for consent to the subsequent search by accepting the district court's narrow interpretation of the parole agreement and by declining to press the consent-by-agreement issue before the district court. An argument not made on an issue before the district court is ordinarily waived. *State v. Evans*, 671 N.W.2d 720, 724 (Iowa 2003); *Donnelly v. Brown, Winick, Graves, Gross, Baskerville, Schoenebaum, & Walker, P.L.C.*, 599 N.W.2d 677, 682 (Iowa 1999); *State v. McCright*, 569 N.W.2d 605, 607 (Iowa 1997).

On the question of consent pursuant to the encounter at the door, the State preserved the issue at the district court level. The State did not, however, raise the issue in its appellate brief. Instead, the State relies solely upon the consent by agreement. Because the issue of consent at the door is not raised in its appellate brief and is not inextricably intertwined with any other issues properly before us, we ordinarily would deem the issue waived. *Hyler v. Garner*, 548 N.W.2d 864, 870, 876 (Iowa 1996); *Richardson v. Neppl*, 182 N.W.2d 384, 390 (Iowa 1970).

In any event, we agree with the district court that the State failed to show that the consent at the motel room door was voluntary. In *Bumper v. North Carolina*, 391 U.S. 543, 88 S. Ct. 1788, 20 L. Ed. 2d 797 (1968) the Supreme Court held that the burden of proving that consent was, in fact, freely and voluntarily given rests with the state. *Bumper*,

391 U.S. at 548, 88 S. Ct. at 1792, 20 L. Ed. 2d at 802. The *Bumper* Court further observed that the burden "cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Id.* at 548–49, 88 S. Ct. at 1792, 20 L. Ed. 2d at 802–03. A search conducted in reliance upon an officer's claim of lawful authority cannot be justified on the basis of consent if the claim of authority turns out to be invalid. *Id.* We came to similar conclusions in two cases. *See State v. Horton*, 625 N.W.2d 362, 364 (Iowa 2001); *State v. Ahern*, 227 N.W.2d 164, 166–67 (Iowa 1975).

The record in this case demonstrates that Ochoa initially refused consent to the search, but then acquiesced when Hatler stated, in response to Ochoa's question, that he was going to conduct the search whether or not Ochoa consented. Under *Bumper*, *Horton*, and *Ahern*, such acquiescence to an invalid assertion of lawful authority does not establish consent to the search and, as a result, the search cannot be supported on this theory.

**VII. Conclusion.**

For the above reasons, we conclude that the warrantless, suspicionless search of the parolee in his motel room by a general law enforcement officer violates article I, section 8 of the Iowa Constitution. As a result, the decision of the court of appeals is vacated, and the district court judgment is affirmed.

**DECISION OF THE COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

All justices concur except Cady, J., who concurs specially.

**CADY, Justice (concurring specially).**

I agree with the holding reached by the majority. The search and seizure clause under the Iowa Constitution does not permit a police officer exercising general law enforcement authority to conduct a suspicionless search of a parolee. I write separately because I believe the majority has not fully identified and explained the key reason for our departure from a contrary holding by the United States Supreme Court under the nearly identical Search and Seizure Clause of the Federal Constitution.

The test used to decide the validity of a warrantless search under article I, section 8 is one of reasonableness. *State v. Naujoks*, 637 N.W.2d 101, 107 (Iowa 2001). This test balances the individual privacy interests at stake against the legitimate interests of the state. *Id.* It is derived from the language of article I, section 8 and is a test we have applied in the past. *See id.* It conforms to the test applied under the Fourth Amendment to the Federal Constitution. *State v. Kreps*, 650 N.W.2d 636, 640–41 (Iowa 2002).

Of course, the test does not readily determine the outcome; it only provides the framework for the analysis. The outcome is a product of an evaluation of the competing interests through the lens of reasonableness. In the end, if the privacy right left by allowing the government to search is reduced to a point that would nullify the purposes of the freedoms demanded by the constitution, the search is unreasonable. On the other hand, an outcome that supports a warrantless search under the circumstances of a particular case gives rise to an exception to the general requirement for a warrant under article I, section 8, which can then be applied in other similar cases and used to guide government

officials in their actions. In this case, the issue is whether an exception to our warrant requirement authorizes state officials to conduct a search of a person's home based solely on the person's status as a parolee.

The interests of the state in searching a parolee and the individual privacy interests of a parolee at stake in this case are the same interests identified in *Samson v. California*, 547 U.S. 843, 126 S. Ct. 2193, 165 L. Ed. 2d 250 (2006). In deciding if it was reasonable for government officials to conduct a suspicionless search of a parolee, the Court first considered the privacy interests of a parolee. *Samson*, 547 U.S. at 850–52, 126 S. Ct. at 2198–99, 165 L. Ed. 2d at 258–59. It found the parolee's interests exceeded those of a prisoner, but were less than those of a probationer and, of course, even less than the privacy interests possessed by an ordinary citizen. *Id.* The Court determined the diminished privacy interests of a parolee were justified in our society by the essential supervision that is attached to parole and the myriad conditions needed to be imposed on the freedoms of a criminal on parole from prison for a parole program to succeed, including the condition that a parolee submit to random searches. *Id.* at 851–52, 126 S. Ct. at 2199, 165 L. Ed. 2d at 258–59.

The Court next considered the government interests at stake. *Id.* at 853, 126 S. Ct. at 2200, 165 L. Ed. 2d at 259–60. It determined the state had an overwhelming interest in closely supervising parolees, and reducing recidivism to promote reintegration in positive citizenship for parolees. *Id.* In balancing these two competing interests, the court found the Fourth Amendment did not prohibit a police officer from searching a parolee without suspicion of criminal activity. *Id.* at 857, 126 S. Ct. at 2202, 165 L. Ed. 2d at 262.

The dissenting opinion in *Samson* quibbled slightly with the extent to which parole reduces the privacy interests of a parolee relative to an ordinary citizen, asserting that the privacy interests of parolees should be on par with those of probationers. *Id.* at 861–62, 126 S. Ct. at 2204–05, 165 L. Ed. 2d at 265–66 (Stevens, J., dissenting). Notwithstanding, the persuasiveness of the dissent can be found in its analysis of the legitimate government interests at stake. Importantly, the dissent did not challenge the legitimacy of the underlying interest of the state to supervise parolees and place conditions that deprive them of rights enjoyed by ordinary citizens. It recognizes these legitimate interests may justify suspicionless searches. The dissent in *Samson* concluded:

> Had the State imposed as a condition of parole a requirement that petitioner submit to random searches by his parole officer, who is "supposed to have in mind the welfare of the [parolee]" and guide the parolee's transition back into society, . . . the condition might have been justified . . . under the special needs doctrine . . . . Likewise, this might have been a different case . . . if the State had had in place programmatic safeguards to ensure evenhandedness.

*Id.* at 864–65, 126 S. Ct. at 2207, 165 L. Ed. 2d at 267–68 (citation omitted) (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 876, 107 S. Ct. 3164, 3170, 97 L. Ed. 2d 709, 719 (1987)). Nevertheless, the *Samson* dissent found such legitimate interests were not served when a search was done by a police officer who was independent and detached from the mission of parole and was merely performing general law enforcement duties. *See id.* at 864–65, 126 S. Ct. at 2207, 165 L. Ed. 2d at 267. Thus, the dissent did not undermine the general legitimacy of the state's interest in searching parolees, but suggested the government interest in searching parolees needed to be carried out by a parole officer so that the activity could properly fit within the special-needs exception to the

warrant requirement relating to searches justified by needs beyond general law enforcement.

This observation is the critical point in the analysis. While I agree with the majority that the State did not satisfy its burden to show reasonableness based on particular facts and circumstances at the time of the search, it is also true that individualized suspicion would not be necessary when the state agent performing the search is furthering the goals involved with parole as to the particular parolee being searched. Importantly, the state's interest in monitoring and supervising a parolee, while quite legitimate, primarily loses its muscle in this case when offered to support the actions of a police officer detached from the mission of supervising and monitoring parolees. On balance, the parole mission, not a mission of general law enforcement, supplies the state with its limited right to search a parolee's home without a warrant. As a result, the balancing between the relatively minimal privacy interests of a parolee and the tenuous interests of the state under the circumstances of this particular case does not favor a search based on parole status alone. The majority's opinion fails to recognize this strong interest to monitor parolees, which must not be lost in any analysis. The only fact that prevents the balancing of interests in this case from tipping in favor of the state and from ultimately creating a broader special needs reasonableness exception to search parolees is the absence of a person who is conducting the search within the rubric of the parole mission.[11] Although a state agent's identity as a parole officer alone would not

---

[11]Although we decided previously in *State v. Cullison*, 173 N.W.2d 533, 537–38 (Iowa 1970), that parole officers are not justified in warrantlessly searching the home of a parolee based on the parolee's status alone, we did not, in that case, balance the legitimate interests of the state in parole supervision with the parolee's interest in privacy.

create a per se exception in all parolee searches, the confluence of such a status and the purpose behind a search associated with it is legitimate and merits strong recognition in a reasonableness analysis.

It is necessary to recognize the mission of parole in the balancing analysis because it permits the state to use this interest to supervise and monitor parolees to conduct searches in those instances when the interest is actually at stake and, at the same time, protects, as required by article I, section 8, even those people in our society with the reduced expectation of privacy from unreasonable intrusions into their lives when the state's interest is not at the forefront of the search. Moreover, this outcome is consistent with the line of cases that distinguish between special needs unrelated to general law enforcement that support a suspicionless search and interests involving enforcement of criminal laws that do not support a suspicionless search. In those cases involving mixed criminal and noncriminal interests, the government interests used to test the reasonableness of the search under the constitution, just as in this case, are those that form the primary goal or aim of the search. *See Ferguson v. City of Charleston*, 532 U.S. 67, 79–81, 121 S. Ct. 1281, 1289–90, 149 L. Ed. 2d 205, 217–19 (2001); *see also City of Indianapolis v. Edmond*, 531 U.S. 32, 40, 121 S. Ct. 447, 453, 148 L. Ed. 2d 333, 343 (2000).

The rights of parolees we recognize under our state constitution result from an analysis not far removed from the analysis of those rights identified by the United States Supreme Court. Yet, we must follow an analysis that allows the real interests at stake to be balanced, which permits the constitutional requirement of reasonableness to be maintained both by the state and the individual.