APPEL, Justice
(concurring in part and dissenting in part).
I readily concur in the majority’s discussion of exigent circumstances. I dissent, however, on the issue of consent to search.
Certainly we all recognize that the home is entitled to special protection under the Fourth Amendment. This special protection of the home has been repeatedly emphasized by the United States Supreme Court and by this court. Protection of the home is wired into the Fourth Amend *585 ment; article I, section 8 of the Iowa Constitution; and in the DNA of judges who believe the constitutional provisions regulating search and seizure have meaning.
For instance, in Boyd v. United States, 116 U.S. 616, 680, 6 S.Ct. 524, 532, 29 L.Ed. 746, 751 (1886), abrogated on other grounds by Warden v. Hayden, 387 U.S. 294, 302, 87 S.Ct. 1642, 1647-48, 18 L.Ed.2d 782, 789 (1967), the Court emphasized that constitutional search and seizure principles apply
to all invasions on the part of the government and its employees of the sanctity of a man’s home and the privacies of life. It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offense; but it is the invasion of his indefeasible right of personal security, personal liberty, and private property....
And then in Weeks v. United States, 232 U.S. 383, 393, 34 S.Ct. 341, 344, 58 L.Ed. 652, 656 (1914), overruled in part on other grounds by Mapp v. Ohio, 367 U.S. 643, 654-55, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081, 1089-90 (1961), the court said:
If letters and private documents [could] ... be [unlawfully] seized [from a home without a warrant] and used in evidence against a citizen accused of an offense, the protection of the [Fourth] Amendment, declaring his right to be secure against such searches and seizures, is of no value, and ... might as well be stricken from the Constitution.
Similarly, in Johnson v. United States, 333 U.S. 10, 13-14, 68 S.Ct. 367, 369, 92 L.Ed. 436, 440 (1948), the Supreme Court, in Justice Jackson’s famous words, declared:
The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate’s disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people’s homes secure only in the discretion of police officers.
While the current United States Supreme Court- has dramatically scaled back Fourth Amendment protections, it has repeatedly emphasized the sanctity of the home as being at the core of Fourth Amendment protections. For example, in United States v. Karo, 468 U.S. 705, 717, 104 S.Ct. 3296, 3304, 82 L.Ed.2d 530, 542 (1984), the Court held that a search warrant is required when an electronic monitor is placed in a drum outside of the home, but is subsequently carried into the home. In Payton v. New York, 445 U.S. 573, 603, 100 S.Ct. 1371, 1388, 63 L.Ed.2d 639, 661 (1980), the Court held that an arrest warrant is required to enter the home of an occupant. In Kyllo v. United States, 533 U.S. 27, 40, 121 S.Ct. 2038, 2046, 150 L.Ed.2d 94, 106 (2001), the Court held that a warrant is required to use a device not in general public use that measures heat within the home even when there is no physical intrusion.
The sanctity of the home was an underpinning of this court’s recent opinion in State v. Ochoa, 792 N.W.2d 260 (Iowa 2010). In Ochoa, we stated, “The home plays a central role in a person’s life, providing sanctuary, comfort, seclusion, security, and identity.” Ochoa, 792 N.W.2d at 289. We observed the Iowa .framers *586 “clearly endorsed” the notion of the sanctity of the home, and we explained our caselaw has historically “reflected considerable solicitude to the sanctity of the home.” Id. at 275, 285. We further emphasized that “[invasions of the home by government officials cannot be regarded as constitutionally insignificant.” Id. at 289.
The need to guard against invasions of the home has been long recognized in the knock-and-talk context. Felix Frankfurter once wrote to Chief Justice Warren in connection with search and seizure law that “[t]o the extent that I am charged, not by you, with being ‘a nut’ on the subject of the ‘knock at the door,’ I am ready to plead guilty.” Bernard Schwartz, Super Chief: Earl Warren and His Supreme Court — A Judicial Biography 266 (1983). Not surprisingly, there is considerable caselaw and academic commentary cautioning about use of the knock-and-talk procedure to evade the warrant requirement ordinarily required before police may search a home.
For example, in Hayes v. State, 794 N.E.2d 492, 497 (Ind.Ct.App.2003), the court noted, “While not per se unlawful, the knock and talk procedure ‘pushes the envelope’ and can easily be misused.” Similarly, in United States v. Johnson, 170 F.3d 708, 721 (7th Cir.1999) (Evans, J., concurring), it was observed that “the seeds of this bad search were sown when the police decided to use the ‘knock and talk’ technique.” Justice Stevens, in his concurring opinion in Georgia v. Randolph, 547 U.S. 103, 124, 126 S.Ct. 1515, 1528-29, 164 L.Ed.2d 208, 228 (2006) (Stevens, J., concurring), suggested that there is a need for a tightened voluntariness standard in connection with knock and talks.
A number of courts have suggested police must have at least reasonable suspicion before a knock-and-talk procedure may be implemented. See, e.g., United States v. Jones, 239 F.3d 716, 720-21 (5th Cir.2001); United States v. Tobin, 923 F.2d 1506, 1511 (11th Cir.1991). Some commentators have suggested the requirement of reasonable suspicion does not go far enough. See, e.g., Craig M. Bradley, “Knock and Talk” and the Fourth Amendment, 84 Ind. L.J. 1099, 1117 (2009) [hereinafter Bradley]. Although the issue of reasonable suspicion is not an issue in this case, these authorities cited above demonstrate the sensitivity of courts in considering the invasion of privacy interests inherent in the knock-and-talk procedure.
Academics have cautioned that knock- and-talk methods may render the search warrant requirement nugatory. See, e.g., Bradley, 84 Ind. L.J. at 1099. These commentators often favor a requirement of a knowing and intentional waiver in order to promote the sanctity of the home and defend the ordinary requirements of probable cause and a judicial warrant before a home may be searched. Id. at 1127.
With this background, we now turn to the issue of consent in the present case. In State v. Pals, 805 N.W.2d 767 (Iowa 2011), this court determined that an automobile search was invalid under article I, section 8 of the Iowa Constitution. We noted weaknesses in the federal court application of Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Pals, 805 N.W.2d at 779-82. While we reserved the issue of whether to adopt a moré demanding “knowing and voluntary waiver test” under Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), for another day, we held that any application of a totality-of-the-circumstances test to determine whether consent was voluntary must be done with rigor to promote the constitutional values underlying article I, section 8. Pals, 805 N.W.2d at 782. Although we are *587 confronted with a different factual scenario in this case, applying the more rigorous totality-of-the-circumstances test described in Pals leads to the conclusion that the consent in this case should be considered involuntary.
First, I begin with recognition that this case involves a search of the home. One of the abuses that gave rise to the Fourth Amendment was the abuse caused by the King’s agents through dragnet searches of homes without probable cause which were purportedly authorized by general warrants and writs of assistance. In light of the history, and the wording of the Fourth Amendment itself, protection of the home from generalized searches not supported by probable cause has long been considered at the core of search and seizure law. See Johnson, 333 U.S. at 14, 68 S.Ct. at 369, 92 L.Ed. at 440; Boyd, 116 U.S. at 630, 6 S.Ct. at 632, 29 L.Ed. at 751; see also Kyllo, 533 U.S. at 40, 121 S.Ct. at 2046, 150 L.Ed.2d at 106; Karo, 468 U.S. at 716-17, 104 S.Ct. at 3304, 82 L.Ed.2d at 542; Payton, 445 U.S. at 603, 100 S.Ct. at 1388, 63 L.Ed.2d at 661. Our cases recognize the sanctity of the home in the Iowa constitutional tradition as well. See, e.g., Ochoa, 792 N.W.2d at 274-75; State v. Sheridan, 121 Iowa 164, 167, 96 N.W. 730, 731 (1903). Most recently, in Ochoa, we built on earlier state precedent, which noted that “the right of officers to thrust themselves into the home is a matter of ‘grave concern.’ ” Id. (quoting State v. Brant, 260 Iowa 758, 763, 150 N.W.2d 621, 625 (1967)).
In short, there is ample support for the common sense notion that we should be especially solicitous of the privacy interest in a person’s home in considering search and seizure questions under article I, section 8 of the Iowa Constitution. The centrality of the home in search and seizure law dictates that we engage in a searching analysis before we conclude that the constitutional right to privacy in the home has been waived in the knock-and-talk context. “[T]he closer officers come to intrusion into a dwelling, the greater the constitutional protection.” State v. Ferrier, 136 Wash.2d 103, 960 P.2d 927, 931 (1998) (citation and internal quotation marks omitted); see also State v. Brown, 356 Ark. 460, 156 S.W.3d 722, 731 (2004) (fundamental interest in the home requires that any violation requires strict scrutiny and compelling state interest). Therefore, in the knock-and-talk context we should take seriously the notion that “physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.” United States v. U.S. Dist. Ct., 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752, 764 (1972).
Second, I think it obvious that knock and talks have an element of inherent coercion.[16] I note the admonition of Caleb Foote many years ago that “what on their face are merely words of request take on color from the officer’s uniform, badge, gun, and demeanor.” Caleb Foote, The Fourth Amendment: Obstacle or Necessity in the Law of Arrest?, 51 J.Crim. L. & Criminology 402, 403 (1960). It has more recently been observed that “[i]t is inherently improbable that criminal suspects voluntarily would consent to the discovery of the very evidence necessary to seal their legal demise.” Christo Lassiter, Eliminating Consent from the Lexicon of Traffic Stop Interrogations, 27 Cap. U.L.Rev. 79, 128 (1998). A police request for con *588 sent “however gently phrased, is likely to be taken by even the toughest citizen as a command. Refusal of requested ‘permission’ is thought by most of us to risk unpleasant, though unknown, consequences.” H. Richard Uviller, Tempered Zeal: A Columbia Law Professor’s Year on the Streets with the New-York City Police 81 (1988).[17] As a result, we have recently said that any application of Schneckloth must be made “with teeth” and cannot involve a cursory review of evidence leading to an inevitable conclusion. See Pals, 805 N.W.2d at 782; see also Adrian J. Barrio, Note, Rethinking Schneckloth v. Bustamonte: Incorporating Obedience Theory into the Supreme Court’s Conception of Voluntary Consent, 1997 U. Ill. L.Rev. 215, 238 (1997).
Third, there is a question regarding a promise of leniency or similar representations. In this case, law enforcement officers represented that they were not interested in the crimes of the homeowner, but only in the health of third parties. This representation is indistinguishable from the representation made in State v. Howard, 509 N.W.2d 764 (Iowa 1993). In Howard, we held that an officer’s statement that “no one was in trouble and that the officer intended only to recover the stolen property” was a sufficient promise of leniency to invalidate consent to search. Howard, 509 N.W.2d at 766.
Further, in State v. Reinier, 628 N.W.2d 460, 469 (Iowa 2001), a resident signed a written consent form stating that the resident consented to the search, that the consent was “free from duress and coercion,” that the party could ask the officers “to stop searching at any time,” and that the officers could not make the search of the property except “by legal warrant.” Appendix at 56, State v. Reinier, 628 N.W.2d 460 (Iowa 2001) (No. 99-1963). Notwithstanding the execution of the consent, the officers’ statements that they were not looking for small quantities of drugs but “meth labs” and “major dealers” were found to bear on the voluntariness of the consent because the statements reflected limitations on the nature of the crime under investigation. We stated in Reinier that such statements “subtly create a false belief that no adverse consequences” will result from the search even when the police obtain a written consent to search from the defendant. Reinier, 628 N.W.2d at 469. Like Howard, our holding and analysis in Reinier strongly indicates the consent in this case should not be considered voluntary.
A ruling to the contrary in this case would amount to a departure from our established approach in Howard and Rein-ier. Citing Reinier with approval, Professor LaFave emphasizes that even a truthful representation that tends to minimize the consequences undermines voluntariness. 4 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 8.2(n), at 140 (4th ed.2004) [hereinafter LaFave],
Fourth, there was an assertion of authority when the officers directed persons to sit on couches and leave the premises. It may not have technically amounted to a seizure, but nonetheless it appears that police were asserting control of the situation. Police commands in the confines of a home suggest consent may be more a product of acquiescence than a truly voluntary act. This conduct is a factor that tips against voluntariness. See Randolph, 547 U.S. at 121, 126 S.Ct. at 1527, 164 L.Ed.2d at 226-27 (stating where police separate co-occupant for purpose of avoiding possible objections of one of the occupants to *589 the search, the search is invalid). This is precisely what occurred in this case.
Fifth, law enforcement did not advise the resident that she had a right to refuse consent. We discussed this element extensively in Pals, observing a disclosure of the right to decline the search is a very important feature of determining whether there has been an appropriate balance between police authority and the rights of citizens. See Pals, 805 N.W.2d at 783. As noted by Justice Stevens in the context of the search of a home, cotenants should be advised that “each of the partners has a constitutional right that he or she may independently assert or waive.” Randolph, 547 U.S. at 125, 126 S.Ct. at 1529, 164 L.Ed.2d at 229 (Stevens, J., concurring). While under a Schneckloth-type totality-of-the-circumstances test the failure to inform a suspect of the right to refuse consent is not dispositive, I would accord it great weight in the knock-and-talk context. Where the privacy interests are the highest and most intense, a truly voluntary consent to search is less likely than where the invasion of privacy is minimal. Stated in other words, ignorant consent does not seem likely to be truly voluntary when uniformed police arrive at the home and seek to search highly private areas.[18]
In this regard, it is important to further note that the repetitive refusal to consent is an aggravating factor.[19] 4 LaFave § 8.2(f), at 98 (stating it would seem that a suspect’s earlier refusal to give consent is a factor which is properly taken into account as part of the totality of circumstances in judging the later consent). At least one commentator has suggested that once a person declines consent to a search, a rule similar to that in Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378, 386 (1981), should apply, namely, that police must scrupulously honor the request in order to avoid implicit coercion incompatible with Fourth Amendment principles. Tracey Maclin, The Good and Bad News About Consent Searches in the Supreme Court, 39 McGeorge L.Rev. 27, 80-81 (2008).
Under the circumstances, namely, a search of a home, the lack of a clear statement of the right to refuse consent, statements limiting the purpose of the search, and the repeated refusal to consent to search, I would hold the search is involuntary under article I, section 8 of the Iowa Constitution. As noted in Reinier:
Police can request consent to enter and search a home in the course of investigating a complaint without intimidation, implied authority, or minimizing the consequences. We think the fair accommodation between the interest in effective law enforcement and our fundamental belief in fair law enforcement procedures requires this conclusion.
Reinier, 628 N.W.2d at 469.
The cases try to put a degree of structure on the determination of voluntariness, and I think that Howard, Reinier, and Randolph, collectively require a finding of involuntariness. If we do not utilize this caselaw to structure the analysis, we are left with a wide open, totality-of-the-circumstances test in which the seven members of this court, in essence, sit as a jury to weigh whether the consent was really a voluntary one or whether it was directly or *590 indirectly coerced. Our caselaw, of course, has long recognized that atmospherics play an important role in that determination. We seek a realistic, and not a formal, assessment of the totality of circumstances. In my view, the majority does not give proper recognition to the notion that the consent exception to the warrant requirement is a “ ‘jealously and carefully drawn’ ” exception. Randolph, 547 U.S. at 109, 126 S.Ct. at 1520, 164 L.Ed.2d at 219 (quoting Jones v. United States, 357 U.S. 493, 499, 78 S.Ct. 1253, 1257, 2 L.Ed.2d 1514, 1519 (1958)).
Yet, it is not at all surprising, and indeed, it is completely to be expected, that members of this court, like members of a jury, would have different views in many cases. Specifically, the majority believes the record shows that the resident had knowledge of her right to decline the request to search and that the environment was not sufficiently coercive to invalidate the search. For the reasons already stated, I see the situation much differently.
In Pals, • we declined to reach the question of whether we should abandon a Schneckloth-type voluntariness test in favor of the knowing and voluntary waiver test in Zerbst. Pals, 805 N.W.2d at 782. It was unnecessary in Pals to .reach the larger issue as the court determined a narrower ground was sufficient to decide the issues at hand. Id.
While deciding an issue on narrow grounds is generally sound, this case demonstrates that a Schneckloth-type volun-tariness test, even one “with teeth,” does not yield completely satisfactory results. As a leading authority has noted in the context of Schneckloth, “[I]t can seldom be said with confidence that a particular combination of factors will inevitably ensure a finding of either consent or no consent” because of the difficulty in applying the multifactored voluntariness test. 4 La-Fave § 8.2, at 53-54. The spongy nature of the Schneckloth voluntariness test has not escaped the courts, where it has been noted that courts can be bogged down in “needless suppression motions, hearings, and appeals.” Hayes v. State, 794 N.E.2d 492, 497-98 (Ind.Ct.App.2003).[20]
There have been several judicial reactions to the inherent instability of Schneckloth-type totality-of-the-circumstances review. One, as noted by Professor Weinreb, has been for courts to simply “provide a lengthy factual description followed by a conclusion ... without anything to connect the two.” Lloyd L. Weinreb, Generalities of the Fourth Amendment, 42 U. Chi. L.Rev. 47, 57 (1974). Another approach is to give lip service to the open-ended totality-of-the-eircumstances test in Schneckloth, but instead focus on something else, such as the wording of the request (was it a question or a demand) or upon police misconduct. See William J. Stuntz, Privacy’s Problem and the Law of Criminal Procedure, 93 Mich. L.Rev. 1016, 1064 (1995) (stating that the consent issue often turns on whether police frame command as a question or a demand); Brian A. Sutherland, Note, Whether Consent to Search Was Given Voluntarily: A Statistical Analysis of Factors That Predict the Suppression Rulings of the Federal District Courts, 81 N.Y.U. L.Rev. 2192, 2195 (2006) (finding that police misconduct rather than volun-tariness factors is most predictive of outcomes). Even these reformulated shortcuts are not always consistently applied, *591 with the end result that there is considerable instability in the caselaw, with nuances and hairsplitting ultimately deciding the cases. See generally Fern L. Kletter, Annotation, Construction and Application of Rule Permitting Knock and Talk Visits Under Fourth Amendment and State Constitutions, 15 A.L.R. 6th 515 (2006) (citing hundreds of cases with differing results).
In light of the difficulties of applying a multifactored test, a number of states have adopted the view that in the knock-and-talk setting, police must first advise a resident of his or her right to refuse consent before consent may be considered voluntary. See, e.g., State v. Brown, 356 Ark. 460, 156 S.W.3d 722, 732 (2004); Graves v. State, 708 So.2d 858, 864 (Miss.1997); State v. Johnson, 68 N.J. 349, 346 A.2d 66, 68 (1975); State v. Ferrier, 136 Wash.2d 103, 960 P.2d 927, 932-33 (1998).[21] These cases generally find that knock-and-talk procedures carry with them a degree of coercion; that the home is entitled to special Fourth Amendment protection; and that as a result, a resident must be advised that they may lawfully refuse to give consent.
It is sometimes claimed that advising a person of the right to refuse consent would deprive police of an effective law enforcement tool. Indeed, Schneckloth itself states that a requirement of a warning would “create serious doubt whether consent searches could continue to be conducted.” Schneckloth, 412 U.S. at 229, 93 S.Ct. at 2049, 36 L.Ed.2d at 864. Such an assertion is logically flawed and factually incorrect.
First, the effective law enforcement argument proves too much. If depriving police of a tool that produces evidence is the standard, the search and seizure provisions of article I, section 8 of the Iowa Constitution would never be enforced and it would be effectively repealed. As noted by the United States Supreme Court in the context of federal search and seizure law, “[T]he mere fact that law enforcement may be made more efficient can never by itself justify disregard of the Fourth Amendment.” Mincey v. Arizona, 437 U.S. 385, 393, 98 S.Ct. 2408, 2414, 57 L.Ed.2d 290, 301 (1978). The same is true under article I, section 8 of the Iowa Constitution.
*592 Further, the notion that effective law enforcement rests upon citizen ignorance is not a principle that should be relied upon in a democratic state based on the rule of law. While justice should be blind to irrelevancies when weighing the evidence in the courtroom, citizens facing searches of their homes are entitled to have their eyes open. Justice Goldberg got it right fifty years ago in Escobedo v. Illinois, 378 U.S. 478, 490, 84 S.Ct. 1758, 1764, 12 L.Ed.2d 977, 985 (1964), when he wrote, “We have also learned the companion lesson of history that no system of criminal justice can, or should, survive if it eomes to depend for its continued effectiveness on the citizens’ abdication through unawareness of their constitutional rights.” See also James A. Adams, Search and Seizure As Seen by Supreme Court Justices: Are They Serious or Is This Just Judicial Humor?, 12 St. Louis U. Pub. L.Rev. 413, 449 (1993) [hereinafter Adams] (stating “constitutional rights are not to be hidden or only grudgingly given”).
In any event, the available empirical evidence is that requiring knowledge of the right to refuse consent does not dramatically reduce the number of consent searches. Empirical data from Ohio and New Jersey demonstrate that requiring warnings in the context of automobile searches only marginally decreases consent to search. See Ulya Lichtenberg, Miranda in Ohio: The Effects of Robinette on the “Voluntary” Waiver of Fourth Amendment Rights, 44 How. L.J. 349, 370 (2001) (stating warnings reduced consent to search by motorists by less than ten percent).
The Schneckloth Court also declared that it would be “impractical” to provide warnings in the give and take of police encounters with citizens. Professor Adams declared such an argument “absurd.” Adams, 12 St. Louis L.Rev. at 447. Subsequent events have vindicated his position. California and New Jersey have agreed to settlements of lawsuits which require written warnings for motorists when officers seek consent to search. The FBI has used written consents that advise citizens of their right to refuse consent since the time of Schneckloth, and the caselaw across the country demonstrates that law enforcement officers commonly seek written consent to search. See, e.g., United States v. Boone, 245 F.3d 352, 362 (4th Cir.2001); United States v. Maez, 872 F.2d 1444, 1453-54 (10th Cir.1989); United States v. Tatman, 615 F.Supp.2d 664, 670 (S.D.Ohio 2008); State v. Brown, 356 Ark. 460, 156 S.W.3d 722, 724-25 (2004).
Indeed, law enforcement authorities in Iowa are no different than those in other states when it comes to written consent to search. Our caselaw shows that written consent forms that advise a party of his right to refuse consent are practical and in use in Iowa. See State v. Howard, 509 N.W.2d 764 (Iowa 1993); State v. Dougherty, No. 09-0812, 2011 WL 441551, at *2 (Iowa Ct.App. Feb. 9, 2011); State v. DeWitt, No. 02-1379, 2003 WL 22805617, at *2 (Iowa Ct.App. Nov. 26, 2003). And, in this case, law enforcement officers properly recorded the encounter, thereby eliminating the “he said, she said” swearing match.[22] Whatever else might be true, obtaining written consents that contain appropriate brief statements advising citizens of the right to refuse consent is not impractical at all.
Indeed, our precedents are strongly pushing in the direction of cleaning up Schneckloth. In Welch v. Iowa Depar *593 tment of Transportation, 801 N.W.2d 590 (Iowa 2011), this court considered whether a driver could change his mind after he refused to consent to a chemical testing under Iowa’s implied consent law. We held that a driver could not change his mind once he refused. We stated:
[A] bright-line rule has the advantage of providing clear guidance to law enforcement personnel. Clarity as to what the law requires is generally a good thing. It is especially beneficial when the law governs interactions between the police and citizens.
Welch, 801 N.W.2d at 601. This powerful language cuts dead against continued application of the totality-of-the-cireum-stanees test of Schneckloth.
We can continue to employ a multifac-tored test for determining consent issues under article I, section 8. We have improved on this test considerably by applying a more rigorous review than under federal precedents. Yet, the totality-of-the-circumstances test of Schneckloth is inherently unstable.
As a result, I am convinced that it would be better simply to require that law enforcement advise a homeowner or resident of his or her constitutional right to decline to consent to a search. This would provide a much clearer rule for law enforcement and citizens alike. See Welch, 801 N.W.2d at 601. When the homeowner or resident is advised of his or her right to consent, a presumption would arise that the warnings are voluntary. On the other hand, the failure of police to provide such a warning would result in reversal. Such an approach is consistent with constitutional values, provides a more workable rule for law enforcement, and ensures that citizens are aware of their constitutional rights before surrendering them.[23]
In evaluating this case, we must ensure that our approach to article I, section 8 does not establish a framework where constitutional protection “fades away and disappears.” Coolidge v. New Hampshire, 403 U.S. 443, 461, 91 S.Ct. 2022, 2035, 29 L.Ed.2d 564, 580 (1971). A knock-and-talk process whereby police seek consent to search a home raises substantial privacy issues under article I, section 8 of the Iowa Constitution. Under a rigorous application of a Schneckloth-type totality-of-the-circumstances approach, the consent in this case is invalid. In the alternative, we should abandon the totality-of-the-circumstances test of Schneckloth altogether and adopt a requirement that a citizen must be advised of his or her right to refuse consent before a knock-and-talk search is valid. Such an approach is more stable than other alternatives; provides a brighter line for law enforcement and citizens alike; is more consistent with the values underlying article I, section 8; and would be a significant improvement in our search and seizure law.
In any event, this case, decided by a four to three vote, has a clear practical message. When law enforcement does not advise a homeowner or resident of their right to refuse consent, a subsequent search might well be found invalid under *594 the difficult to apply totality-of-the-circumstances Schneckbth test as applied by this court under article I, section 8 of the Iowa Constitution. Law enforcement -will increase the likelihood that a search of the home will be found “free and voluntary,” even under the current test, by advising home owners or residents of their right to refuse.
WIGGINS and HECHT, JJ„ join this concurrence in part and dissent in part.

. There is authority for the proposition that the level of inherent coercion in the context of a knock and talk is less than in a traffic stop. See State v. Domicz, 188 N.J. 285, 907 A.2d 395, 407 (2006). This may be true, but while the element of coercion may be somewhat less, the interest in privacy is at its zenith in the home.

. These authorities are cited in Tracey Maclin, The Good and Bad News About Consent Searches in the Supreme Court, 39 McGeorge L.Rev. 27, 28 n. 6, 52 n. 162 (2008).

. For exploration of the concept of ignorant consent, see Morgan Cloud, Ignorance and Democracy, 39 Tex. Tech. L.Rev. 1143 (2007).

. Oddly, the special concurrence turns this factor on its head, suggesting that because Audsley at first refused, her later consent is voluntary. The message of the special concurrence is that repeated police pressure on a resident after he or she refuses consent, which ultimately overcomes his or her resistance, produces a valid search.

. According to a leading Fourth Amendment treatise, the Supreme Court’s treatment of consent in Schneckloth "generates almost universal criticism from commentators.” See Thomas K. Clancy, The Fourth Amendment: Its History and Interpretation § 10.4.1, at 418 (2008) (citing numerous law review commentaries).

. There are now literally thousands of decisions where state supreme courts have interpreted state constitutions to grant claims of individual rights and liberties under circumstances where the United States Supreme Court has declined to do so. See 1 Jennifer Friesen, State Constitutional Law: Litigating Individual Rights, Claims, and Defenses § 1.01[1], at 1-2 (4th ed.2006); see generally Robert F. Williams, The Law of American State Constitutions (2009) [hereinafter Williams]. The principle of independent interpretation applies when state and federal constitutional provisions are identical or nearly identical. See State v. Ochoa, 792 N.W.2d 260, 264-66 (Iowa 2010.) (generally discussing independent state law grounds, including when provisions of state and federal constitution are identical in language); State v. Cline, 617 N.W.2d 277, 284-85 (Iowa 2000) (stating "no principle of law requires this court to interpret the Iowa Constitution in line with the United States Constitution”), abrogated on other grounds by State v. Turner, 630 N.W.2d 601, 606 n. 2 (Iowa 2001); see also State v. Christensen, 131 Idaho 143, 953 P.2d 583, 586 (1998) ("Long gone are the days when state courts will blindly apply United States Supreme Court interpretation and methodology” even under nearly identically worded constitutional provisions) (citation and internal quotation marks omitted); Davenport v. Garcia, 834 S.W.2d 4, 20 (Tex.1992) (stating state courts should borrow from well-reasoned and persuasive precedent when "deemed helpful, but should never feel compelled to parrot the federal judiciary”); Williams at 135 (stating the notion that United States Supreme Court precedents are presumptively correct under state law is "simply wrong”).

. Affordable technology now allows interrogations, citizen encounters, and identification procedures such as lineups to be recorded. Such recordings reduce the potential for factual disputes and promote adherence to professional law enforcement practices.

. In this case, Lowe did not brief the issue of whether Schneckloth should be abandoned and replaced by a mandatory warning or with a Zerbst-1ype test. The majority thus declines to consider whether we should abandon Schneckloth under either theory. Unlike the majority, I regard the issue as sufficiently intertwined to allow the court to address the issue. See Feld v. Borkowski, 790 N.W.2d 72, 84 (Iowa 2010) (Appel, J., concurring in part and dissenting in part). In any event, it is critically important that the court not establish a pattern of narrowly viewing issues in order to defeat assertions of individual rights and then of broadly viewing issues in order to uphold the actions of the state or business actors against claims of individuals.